EJECTMENT.

## Taylor *vs* Fletcher.

### APPEAL FROM THE BALLARD CIRCUIT.

*Case 23.*    *Patents for Military Land. Parol evidence. Scire
Facias.*

*September 29.*    CHIEF JUSTICE EWING delivered the opinion of the Court.

ROBERT FLETCHER, claiming under four patents for 160
*Case stated and* acres each, issued in September, 1835, on four entries,
*judgment of the*
*Circuit Court.* made in the Receiver's office, under the laws enacted for

the appropriation of the vacant lands on the south west side of the Tennessee river, brought an action of ejectment against Read and others, who were, and had been for some years, occupants upon the land claimed under a patent to Wm. Croghan, for 1,366¾ acres, bearing date the 30th November, 1826, founded on a survey made on the 9th December, 1825, by virtue of an entry made on a military warrant, on the 7th of August, 1784. Fletcher succeeded in the Court below, in obtaining a verdict and judgment, and the defendants have appealed to this Court.

It is urged, on the part of the plaintiff below, that though the patent under which the defendants claim is *older in date than the patent of the plaintiff, that the* survey and patent embraces land entirely different from the land embraced by the entry, and that the entry embraces no part of the land claimed by the plaintiff, and that the patent is declared void by the 4th section of the act of 1820, (2 *Stat. Laws*, 1043,) and should be treated as a nullity. On the part of the defendants below, it is insisted that the survey and patent of Croghan are not variant from the entry, but embrace the precise same land embraced and intended to be appropriated by the entry, and if they did not, that the plaintiff has no right to impeach the patent of Croghan, as his survey was made and patent issued long prior to the entry of the plaintiff, which was made and allowed by the Receiver, knowingly, in violation and fraud of the 17th section of the act of 1821, (2 *Stat. Laws*, 1051,) and 16th section of the act of 1825, (2 *Stat. Laws*, 1057,) the first of which provides that the Register shall not sell, and the last, that the Receiver shall not sell any section or portion of a section of land which may be included in any military entry or *survey*, provided he is satisfied of such interferance by an attested copy of such entry or *survey* being served on him, or otherwise, and that no entry could be made of lands that had not been previously exposed to sale and stricken off to the State.

In the case of *Bledsoe's devisees* vs *Wells*, (4 *Bibb*, 330,) which was a case in which a patent had issued on a Treasury warrant, which had been located within that

The general rule is that a patent may not be impeached collat-

TAYLOR
*vs*
FLETCHER.

erally by axtrin-
sic evidence *de
hors* the patent
itself. (4 *Bibb*,
330,) cited and
approved.

tract of country reserved for the officers and soldiers, in contravention of the express inhibition of the statute of 1799, this Court say, "we are not of opinion that parol evidence of a fact *dehors* the patent, was admissible in this case for the purpose of avoiding or defeating the patent. For though a patent, when it appears on its face to be illegal, may be considered void and treated as a nullity, yet if it appear perfect on its face, it cannot be vacated by matters *dehors* the patent, but by *scire facias* or other regular mode of proceeding, instituted for the purpose of vacating it." The doctrine here asserted, seems fully sanctioned and sustained by the authorities referred to and other English authorities. A patent is *record* evidence that a title has passed from the Commonwealth, isued under the great seal of State by the competent authorities, and while it remains in force, and is not vacated or annulled by some direct mode of proceeding, calling in question its validity, should not, in the general, be collaterally impeached or questioned, unless in the case where its own nullity, for illegality, appears on its face, in which case the evidence of its nullity is of as high grade as the evidence of the grant.

It is true fraud viciates the most solemn proceedings, as judgments, decrees or patents. But we apprehend that fraud cannot be relied upon or proven to impeach either, collaterally in the trial of an issue at law, but only in a direct proceeding, the object of which is to reverse, annul or vacate the same, and that either should be regarded, in the general, as importing absolute verity, until reversed, vacated or annuled by some direct proceeding, affording as high grade of their annulment as of their creation.

There are excep-
tions to the gen-
eral rule. 1st.
Where the Legis-
lature has de-
clared that the
patent shall be
void if issued in
contravention of
a described state
of case And 2d.
Where they have
declared the pat-
ent shall be
deemed *fraudu-*

There are two exceptions to the rule here laid down, with respect to the impeachment of patents. The first is where the Legislature has declared that the *patent* shall be *void*, if issued in contravention of a described state of case; the second is, where they have declared that the *patent* shall be deemed *fraudulent*, if issued under similar circumstances. Whatever might be our opinion as to the propriety of those exceptions, they have been too long and repeatedly sanctioned and sustained by the decisions

of this Court, commencing with the case of *Dallam* vs *Handley*, (2 *Marshall*, 418,) and ending with the case of *Sutton* vs *Menser*, (6 *B. Monroe*, 433,) now to be questioned.

In the two exceptions referred to, the Legislative enactment is made to apply to and *act directly* upon the *patent*, annulling the same, and may imply an authority to prove by parol, on the trial of a collateral issue, those facts which will bring the patent under the legislative denunciation.

Subjecting the two patents that are brought in conflict in this case, to the rule and exceptions intimated, and it follows that the patent of the plaintiff below cannot be impeached or its invalidity shown, by parol proof, in the trial of the issue between the parties. Though it was obtained obviously and knowingly in contravention of the legislative enactments referred to, and perhaps by a fraudulent combination between the Receiver and plaintiff, these enactments or any other that we have seen, do not declare the *patent fraudulent* or *void;* and cases might occur in which both the locator and Receiver might be ignorant of the *interferance of the claims entered, with* any entry or survey of a military claim.

But as the statute of 1820, (2 *Stat. Laws*, 1343,) expressly declares, in reference to the military entry under which the defendants claim, "that any *patent* issuing on a survey made contrary to the location, shall be *void* to all intents and purposes, so far as the same may be different or variant from the location," the defendant's patent falls within the exception to the general rule before intimated, and may be impeached by the plaintiff by the introduction of parol or other proof showing the variance between the entry and patent; and so far as such variance is shown to exist, the patent of the defendants may be treated as a nullity, and afford no protection to the defendants.

The operation of the statutes and general rule, with the exceptions referred to, presents a hard case. Junior patents obtained in fraud of the law, founded upon the pitiful consideration of twelve and a half cents per acre, are made to prevail in case a variance between the entry

TAYLOR
*vs*
FLETCHER.

*lent* if issued under similar circumstances, (2 *Marshall*; 6 *B. Monroe*, 433.)

Patents issued upon Kentucky land warrants for lands south of Tennessee, cannot be collaterally questioned even when coming in contact with a patent on a military entry survey; but the latter may be impeached by such proof.

TAYLOR
*vs*
FLETCHER.

and patent is shown, against an elder patent founded upon the meritorious consideration of military services rendered in our revolutionary conflict.

But though the defendants may not be able to succeed, but the plaintiff may prevail to the extent of the variance, if any exists, in the trial of the issue in ejectment, we can hardly believe that the defendants or elder patentee, in that event, would be without remedy.

It is said by that learned commentator, Blackstone, (3 *Vol. B. Com.* 261,) "where the crown hath *unadvisedly* granted any thing by letters patent, which *ought* not to be *granted*, or where the patentee hath done an act that amounts to a forfeiture of the grant, the remedy to repeal the patent, is by writ of *scire facias* in chancery. This may be brought either on the part of the King, in order to reserve the thing granted, or if the grant be injurious to a subject, the King is bound, of right, to permit him, (upon his petition,) to use his royal name for repealing the patent in a *scire facias*."

It is also said in the 5th vol. of Comyn's Digest, title Patent, 356, "that if a patent is founded upon a *false suggestion*, the King may have a *scire facias* for repealing it." "So if the King grant, by his letters patent, the *same thing* to *several persons*, a *scire facias* lies for repealing the *last* patent: (4 *Inst.* 88.) And in such case the *scire facias* shall be brought by the *first patentee*: (4 *Inst.* 88, *and other authorities referred to*.) And a *scire facias* by the *last* patentee shall not be allowed, though he *seems* to have the *right* with him."

"A *scire facias* for repealing a patent may be sued in chancery, or in the King's Bench, (4 *Inst.* 72, 79, 88; *Dy.* 197, *b.*; 3 *Lev.* 220;")

"The patent itself is a sufficient record, upon which a *scire facias* may be founded for repealing the same."

The Commonwealth in this republic, occupies, in many respects, the place of the King in England, and the proceedings of course should be instituted in the name of the Commonwealth, if such proceedings would lie here.

The authorities referred to pretty clearly indicate, as we conceive, the course to be pursued, and the remedy to be obtained by the elder patentee under military entries,

The *scire facias* in the name of the King, was the ancient and appropriate proceeding for the repeal of a patent, which may have issued, injuriously effecting the rights of others, founded upon a false suggestion, and the first patentee here may sue in the name of the Commonwealth for that purpose.

against those fraudulent claims which have been know-
ingly located so as to interfere with them. The patentee
under the military entry is injured, if his lands be taken
by those speculating claims, and the Commonwealth but
little benefitted. This survey having been made, and
perhaps in his absence, and without his knowledge, by
the regularly constituted surveyor, and a patent issued
thereon, if the land embraced in his survey and patent be
taken he looses all, as well the land embraced in his pat-
ent, as that embraced in his entry, as the entry could not
be resurveyed and carried a second time into grant. And
though the Legislature had declared the patent void, so
far as the same varied from the entry, they had expressly
interdicted the sale or location of claims originating un-
der the laws made for the appropriation of the vacant
lands in that region, from interfering with the *survey* of
the military claimant, thereby indicating a clear inten-
tion to reserve to the Commonwealth the entire control
over the subject unembarrassed by subsequent patents to
individuals under her laws. And had the Commonwealth
never full control over the subject embraced by these sur-
reptitious entries, made knowingly in violation of her
laws, it cannot be questioned that she would either con-
firm the patents issuing in good faith upon these military
claims, though variant from the entry, or adopt some oth-
er regulation honorable to herself and just towards that
meritorious class of claimants

The elder patentee and Commonwealth are both inter-
ested in vacating and annuling junior patents which have
been surreptitiously obtained, producing a conflict with
those military claims, and it would seem to us not only
to be the right, but also the duty of the Commonwealth,
to permit her name to be used in a *scire facias* at the in-
stance and upon the motion of the elder patentee, to re-
peal, annul or vacate the junior patents which have been
thus fraudulently obtained. The Commonwealth had,
by the Legislature, from time to time reduced the price
of the lands on the S. W. side of the Tennessee river, un-
til they were reduced from one dollar and a quarter to
twelve and a half cents per acre, believing as she did, that
all the better lands were taken, she never could have

contemplated that those ninepenny claims would be located on the very best lands of the country, previously embraced and patented to military claimants. But of course, as the question as to their remedy is not questioned, nor necessary to be determined in this case, we are not to be regarded as deciding in its favor definitely, nor of decreeing as to the effect that the denunciation of the statute against the military grant may have upon the same. But allowing to the plaintiff the privilege in this contest, to show by parol proof the varience between the patent and the entry, or rather the departure of the survey and patent from the calls of the entry, and we are perfectly satisfied that the verdict in this case was unauthorized by the proof, and should have been set aside.

To entitle the plaintiff to recover against the military patent, under which the defendants claim, it lies upon him to show, by *clear, satisfactory* and *unequivocal* evidence, that the patent varies from the entry, and the extent thereof. To do so, he must show that the entry was in *fact located* and *intended* to be located in a different place, and to embrace *different land* from that embraced in the patent. It is the want of identity between the entry and patent, and not the want of notoriety in the objects called for in either, that renders the patent void. And this want of identity it lies upon the plaintiff *clearly* and *unequivocally* to make out in proof, or the patent, which is *high record* evidence of a *perfect title* for the land it embraces, must prevail. The entry was made more than sixty years ago, and it cannot be expected that the place of the location, or intended location, can be now shown by living witnesses. All that can be now shown, must be shown by circumstantial evidence, as the correspondence or want of correspondence of objects found upon the ground, with those called for in the entry, or the like circumstantial proof. If, therefore, there be a set of objects found upon the ground embraced by the patent corresponding as well with the calls of the entry, as another set of objects found at another place, we cannot conceive how the jury or Court could determine in favor of the one or the other set of objects, so as to justify them in finding against, and treating as annuled the

*To enable a plaintiff in ejectment to recover against a patent issued upon a military warrant, he must show by clear, satisfactory and unequivocal evidence, that the patent varies from the entry and the extent of such varience. (Ray vs Woods, 2 Ben. Monroe, 217.)*

elder patent.　If so, the military claimant would not have been safe in embracing in his survey the land embraced by either set of objects. . It is certainly true, that in such a state of case, the precise location of the entry, and consequent variance between it and the patent has not been made out by *clear, satisfactory* and *conclusive* evidence which would authorize and sustain the finding of the jury against the elder grant.　That sort of evidence was deemed necessary in the case of *Rays* vs *Woods, &c.,* (2 *B. Monroe,* 217,) and still deemed necessary to justify the finding of the jury against a military patent.

In this case, the entry of Wm. Croghan, under which the defendants claim, was made on the 7th of August, 1784, in the following words: "No. 346. Wm. Croghan enters 1,366⅔ acres, on part of a military warrant, No. 25, beginning at Gen. Clark's upper corner of an entry of 1,500 acres, No. 265, lying on a branch of Mayfield creek, at the corner next the creek, running thence east, 440 poles; thence south, and with Gen. Clark's line for quantity."　Gen. Clark's entry is as follows: "August 6, 1784, No. 256, Geo. Rogers Clark enters 1,500 acres, part of a military warrant, No. 2,292; beginning at the *foot* of the *high land,* where the *first branch of Mayfield* creek above the *Bayou,* on the south side, passes through it, to the bottom or low grounds; running thence south, 75 east, 500 poles; thence at right angles, westwardly, for quantity."

The plaintiff below claims the stream now called Lott's branch, as the branch called for in Clark's entry, and his beginning at the foot of the high land, about one half mile from its mouth, where it passes through the high lands into the bottom, and the creek or slough just below the branch which runs out of Mayfield creek into the Mississippi river when the latter is low, and out of the Mississippi into Mayfield creek, when the Mississippi is high, and which never ceases running the one way or the other, as the *Bayou* called for in Clark's entry.　If this be the true place of Clark's entry, then Croghan's entry, which calls for his upper corner, next to Mayfield creek, when run out according to its calls, will embrace no part

of the land now covered by his patent or embraced in the patent of the plaintiff.

But the defendants claim the stream now called Trueman's creek, as the branch called for in Clark's entry, and a slough or Bayou, which runs out of Mayfield just below the creek on the south, and again unites with the creek about a half a mile below, as the Bayou, and the point where Trueman's creek passes through the high lands to the low ground, as the point of Clark's beginning. Croghan's survey has been run out, and his patent has issued thereon, *regarding the foregoing as the true and proper locative calls of Clark's entry*, and has been made nearly in conformity to the same. And if made entirely in conformity to the same, or based upon Clark's entry as thus laid down, and run out accordingly, the greater part of the land claimed by the plaintiff, and perhaps all the occupants on the same, would be embraced and covered in common, by the entry and patent of Croghan.

We are perfectly satisfied that there is a more perfect correspondence between the calls of *Clark's entry* and the objects found upon the ground at the place designated by the defendants, than at the place claimed by the plaintiff, and the circumstances exhibited in this record, tend more strongly to show the place selected by the defendants, as the true place, rather than that selected by the plaintiff. It must be borne in mind that Clark's, Croghan's, and the the entire block of entries exhibited in the record, were made in August, the dryest month in the year, and all were made from the 2d to the 12th of the month inclusive, and were probably made by the same company of locators, as the country was then a savage wilderness. On the 6th of August, when Clark's entry was made, the stream now called Salty branch, was in all reasonable likelihood, a dry ravene, and not a branch. The witnesses describe it as a very small stream, which runs in wet weather and goes dry in dry weather, and some of them say it resembles more a deep ravene, cut by the flowing of water from the high grounds in wet weather, than a branch or creek. The creek below that runs out of Mayfield into the Mississippi, claimed now as

a Bayou, was never called or known by that name, nor does it answer the description of a Bayou better, if as well, as the one claimed by the defendants as the Bayou called for. It has been known for many years past as the back slough or creek, and as the town creek, and as we think, is better named by calling it a creek or branch of Mayfield creek, than a slough or bayou. Besides, an entry was made in the name of Wm. Croghan, on the 2d of August, only four days before Clark's entry was made, and most likely by the same company of locators, and the stream now claimed as a bayou, was called a *creek.* It being called a *creek* on the 2d of August, 1784, it is highly probable, indeed almost certain, that it would not be called a bayou only four days afterwards. Again, the bluff below the mouth of Salty branch, is said to be *the most notorious and attractive object, from the mouth to the source* of Mayfield. It is strange, therefore, and almost incredible, if Clark's entry was intended to be located on Salty branch, that those bluffs should not be called for as the best object to give identity, as well as notoriety to the land intended to be embraced by the entry.

On the other hand, the stream now called Trueman's *creek*, and sometimes *branch*, was most likely, in the dry month of August, a small stream, and might well be denominated a branch. Besides, it is in fact a branch or limb of Mayfield, and when speaking in reference to both as Clark's entry does, it might well be called a branch. Again, the locators were no doubt Virginians, and it is proven that they are in the habit of calling pretty large streams branches.

There is a slough or bayou just below Trueman's creek, which has for years past, been promiscuously called a slough and bayou, and which answers better the description of a bayou than the stream or creek claimed by the plaintiff as a bayou. The foot of the high lands through which Trueman's creek runs, is about three quarters of a mile or a little more, from the mouth of the creek, and which point was most likely the point intended as Clark's beginning.

There are other circumstances which we will not stop to enumerate, tending to the satisfactory conclusion that the place claimed by the plaintiff was not the place intended to be embraced by 'Clark's entry, and that the place claimed by the defendants is, in all reasonable likelihood, the true place intended to be embraced by the same.

It is, therefore, the opinion of this Court, that the judg¦ ment of the Circuit Court be reversed, and cause remanded, that a new trial may be granted.

*Cates & Lindsey and Morehead & Reed* for appellant; *Harlan & Craddock and Pirtle* for appellee.