## SMELTING COMPANY *v.* KEMP.

1. A patent, duly signed, countersigned, and sealed, for public lands which, at the time it was issued, the Land Department had, under the statute, authority to convey cannot be collaterally impeached in an action at law ; and the finding of the department touching the existence of certain facts, or the performance of certain antecedent acts, upon which the lawful exercise of that authority may in a particular case depend, cannot in a court of law be questioned.

2. If in the issuing of a patent the officers of that department take mistaken views of the law, or draw erroneous conclusions from the evidence, or act from either imperfect views of duty or corrupt motives, the party aggrieved cannot set up such matters in a court of law to defeat the patent. He must resort to a court of equity, where he can obtain relief, if his rights are injuriously affected by the existence of the patent, and he possesses such equities as will control the legal title vested in the patentee. A stranger to the title cannot complain of the act of the government in regard thereto.

3. A defendant in ejectment claimed adversely to the title to a placer mining claim, derived from a patent of the United States bearing date March 29, 1879, which describes, by metes and bounds, the premises, containing one hundred and sixty-four acres and sixty one-hundredths of an acre, more or less. *Held*, that he cannot put in evidence the proceedings in the Land Department for the purpose of showing that the patent was issued upon a single application, including several mining locations, some made after the passage of the act of July 9, 1870, c. 235 (16 Stat. 217), limiting the location of one person or an association of persons to one hundred and sixty acres, and others made after the passage of the act of May 10, 1872, c. 152 (17 id. 91), limiting a location to twenty acres for each individual applicant.

4. A patent issued subsequently to the passage of the said act of 1870 may embrace a placer mining claim consisting of more than one hundred and sixty acres, and including as many adjoining locations as the patentee had purchased. The proceedings to obtain a patent therefor are the same as when the claim covers but one location.

5. The terms " location " and " mining claim " defined.

6. Labor and improvements, within the meaning of the statute, are deemed to have been put on a mining claim, whether it consists of one or more locations, when the labor was performed or the improvements were made for its development, though in fact such labor and improvements may be on ground which originally constituted only one of the locations, or may be at a distance from the claim.

ERROR to the Circuit Court of the United States for the District of Colorado.

This was an action at law brought in one of the courts of Colorado by the St. Louis Smelting and Refining Company, a corporation created under the laws of Missouri, for the possession of a parcel of land in the city of Leadville. On appli-

cation of the defendants it was removed to the Circuit Court of the United States. The complaint is in the usual form of actions for the possession of real property under the practice obtaining in Colorado. It alleges that the plaintiff was duly incorporated, with power to purchase and hold real estate; that it was the owner in fee and entitled to the possession of the premises mentioned, describing them, and that the defendants wrongfully withheld them, to the damage of the plaintiff of $5,000.

The defendants filed an answer admitting that the plaintiff was incorporated as averred, but denying that it was the owner in fee of the demanded premises, or that they were wrongfully detained from its possession, or that it had sustained any damage. The answer also alleged that the plaintiff, as a foreign corporation, was incompetent to acquire title to any real estate in Colorado, except such as might be necessary for the transaction of its business as a smelting and refining company, and that the premises in controversy were not necessary for that purpose, but were acquired for speculation.

The plaintiff filed a replication, denying its incompetency to hold real estate as alleged, and averring that it was authorized, under the laws of Missouri, to buy, sell, and deal in real estate for any purpose whatever; that the property in controversy was acquired as a site for smelting and reduction works, and that such works were afterwards erected upon it and used for reducing and smelting silver ores.

The case was tried in November, 1879. To maintain the issues on its part the plaintiff offered in evidence a patent of the United States to Thomas Starr, dated March 29, 1879, for mining ground, which, it was admitted, included the premises in controversy. The patent recited that pursuant to provisions of chapter six of title thirty-two of the Revised Statutes, there had been deposited in the General Land-Office the plat and field-notes of the placer mining claim of Thomas Starr, the patentee, accompanied by a certificate of the register of the land-office at Fairplay, Colorado, within which district the premises are situated; that Starr had, on the 6th of March, 1879, entered an application for the said claim, which contained one hundred and sixty-four acres of land and sixty-one hundredths of an acre, more or less. The patent also specified the boun-

daries of the tract according to the field-notes, and contained the recitals and words of grant and transfer usually inserted in patents for placer mining land. To the introduction of this patent the defendants objected ; but the record does not state on what grounds the objection was founded, and it was overruled. The patent was accordingly admitted in evidence. The plaintiff traced title to the land by sundry mesne conveyances from the patentee. It also introduced the certificate of the register of the same land-office, showing that the application of Starr at that office to enter and pay for his claim was made on the 18th of March, 1878 ; also a copy of the articles of incorporation of the plaintiff, and of the laws of Missouri under which the incorporation was had ; and proved that, in 1877, prior to the existence of the town of Leadville, the company purchased of the claimant the tract embraced in the patent, for the purpose of erecting reduction works thereon, and that at the time of the purchase and when it commenced the construction of the works the land was unoccupied by other parties.

The plaintiff having rested its case, the defendants offered in evidence a certified copy of the record of proceedings in the General Land-Office at Washington, upon which Starr obtained his patent ; to the introduction of which the plaintiff objected, on the ground that it could only show or tend to show the regularity or irregularity of the proceedings before the executive department in obtaining the patent, or the validity or invalidity of the possessory title or pre-emption right upon which the patent was founded, and that no evidence could be introduced to impeach the patent or attack it collaterally, or in any way affect it in this action. But the court overruled the objection and admitted the record. To this ruling an exception was taken.

The case being closed, the court instructed the jury substantially as follows: That a patent for a mining claim, since the passage of the act of Congress of 1870, could not embrace more than one hundred and sixty acres ; that individuals and associations were, by that act, put upon the same footing, and that either might take that amount, but that by the mining act of Congress of 1872 an individual claimant was limited to twenty acres, whilst an association of persons could still take

one hundred and sixty, as before ; that the proceedings in the land-office were allowed in evidence, in order to show whether the patent was issued upon locations made prior to 1870, and that they showed that the claim of Starr was based upon twelve or fifteen locations, some of which were prior to 1870, and some since then ; and added, that " if Mr. Starr was the owner of these claims, if he had obtained them by purchase, and they were valid and regular locations, he would, under the act, be required, if he desired to obtain a patent for them, to make application for each one of them, to post the notice, as required by the statute, and give the publication, and file his plat and survey, and do all these things which are required in the several claims upon each one of them.  If he had done so, and his right had been supported as to all of them, and the patent had been issued for all of these claims, and each of them described in the patent, there would have been no objection to the patent ; but it was not competent for him to consolidate these claims and put them all in as one claim, and upon notice given as one claim, and publication as one claim, and proceeding throughout as one claim embracing one hundred and sixty-four acres ; " and that the officers of the Land Department had no authority in law to proceed in that way, and, therefore, the patent upon which the plaintiff relied was void and its title failed.

To the instructions given exceptions were taken.  The jury thereupon found for the defendants, and judgment in their favor was accordingly entered.  To review this judgment the plaintiff removed the case here by writ of error.

The case was argued by *Mr. J. H. McGowan* and *Mr. Walter H. Smith* for the plaintiff in error, and by *Mr. Fletcher P. Cuppy* and *Mr. Thomas A. Green* for the defendants in error.

*Mr. Allen G. Thurman*, on behalf of certain interested parties, was heard by the court, in opposition to the judgment below.

MR. JUSTICE FIELD, after stating the case, delivered the opinion of the court, as follows : —

As seen by the statement of the case, the plaintiff relies for a reversal of the judgment upon three grounds : 1st, Error in

admitting the record of the proceedings of the land-office to impeach the validity of the patent to Starr issued upon them; 2d, Error in instructing the jury that a patent for a placer claim, since the act of 1870, could not embrace in any case more than one hundred and sixty acres; and, 3d, Error in instructing the jury that the owner, by purchase of several claims, must take separate proceedings upon each one, in order to obtain a valid patent, and that it was not lawful for him to prosecute a single application upon a consolidation of several claims into one, or for the land-officers, to allow such application and to issue a patent thereon.

We are of opinion that these several grounds are well taken, and that in each particular mentioned the court below erred.

The patent of the United States is the conveyance by which the nation passes its title to portions of the public domain. For the transfer of that title the law has made numerous provisions, designating the persons who may acquire it and the terms of its acquisition. That the provisions may be properly carried out, a land department, as part of the administrative and executive branch of the government, has been created to supervise all the various proceedings taken to obtain the title, from their commencement to their close. In the course of their duty the officers of that department are constantly called upon to hear testimony as to matters presented for their consideration, and to pass upon its competency, credibility, and weight. In that respect they exercise a judicial function, and, therefore, it has been held in various instances by this court that their judgment as to matters of fact, properly determinable by them, is conclusive when brought to notice in a collateral proceeding. Their judgment in such cases is, like that of other special tribunals upon matters within their exclusive jurisdiction, unassailable except by a direct proceeding for its correction or annulment. The execution and record of the patent are the final acts of the officers of the government for the transfer of its title, and, as they can be lawfully performed only after certain steps have been taken, that instrument, duly signed, countersigned, and sealed, not merely operates to pass the title, but is in the nature of an official declaration by that branch of the government to which the alienation of the public

lands, under the law, is intrusted, that all the requirements preliminary to its issue have been complied with. The presumptions thus attending it are not open to rebuttal in an action at law. It is this unassailable character which gives to it its chief, indeed its only, value, as a means of quieting its possessor in the enjoyment of the lands it embraces. If intruders upon them could compel him, in every suit for possession, to establish the validity of the action of the Land Department and the correctness of its ruling upon matters submitted to it, the patent, instead of being a means of peace and security, would subject his rights to constant and ruinous litigation. He would recover one portion of his land if the jury were satisfied that the evidence produced justified the action of that department, and lose another portion, the title whereto rests upon the same facts, because another jury came to a different conclusion. So his rights in different suits upon the same patent would be determined, not by its efficacy as a conveyance of the government, but according to the fluctuating prejudices of different jurymen, or their varying capacities to weigh evidence. *Moore* v. *Wilkinson*, 13 Cal. 478; *Beard* v. *Federy*, 3 Wall. 478, 492.

Of course, when we speak of the conclusive presumptions attending a patent for lands, we assume that it was issued in a case where the department had jurisdiction to act and execute it; that is to say, in a case where the lands belonged to the United States, and provision had been made by law for their sale. If they never were public property, or had previously been disposed of, or if Congress had made no provision for their sale, or had reserved them, the department would have no jurisdiction to transfer them, and its attempted conveyance of them would be inoperative and void, no matter with what seeming regularity the forms of law may have been observed. The action of the department would in that event be like that of any other special tribunal not having jurisdiction of a case which it had assumed to decide. Matters of this kind, disclosing a want of jurisdiction, may be considered by a court of law. In such cases the objection to the patent reaches beyond the action of the special tribunal, and goes to the existence of a subject upon which it was competent to act.

These views are not new in this court; they have been, either in express terms or in substance, affirmed in repeated instances.    One of the earliest cases on the subject was that of *Polk's Lessee* v. *Wendell*, reported in 9th Cranch, where the doctrine we have stated was declared, and the exceptions to it mentioned.    There the plaintiff brought an action upon a patent of North Carolina, issued in 1800, for five thousand acres.    The defendants relied upon a prior patent of the State for twenty-five thousand acres, issued in 1795 to one Sevier, through whom they claimed.    Each patent embraced the lands in controversy, and they were situated in that portion of Tennessee ceded to the United States by North Carolina.    On the trial it was contended that the elder patent was void on its face because it covered more than five thousand acres, the limit prescribed for a single entry by the laws of that State.    Proof was also offered that the lands had not been entered in the office of the entry-taker of the proper county before their cession to the United States, and it was contended that the patent was therefore invalid.    We shall hereafter refer to what the court said as to the alleged excess of quantity in the patent. At present we shall only notice the general doctrine declared as to the unassailability of patents in a court of law, and its decision upon the admissibility of the proof offered.    It seems that a statute of 1777 directed the appointment in each county of an officer called an entry-taker, who was required to receive entries of all vacant lands in his county, and, if the lands thus entered were not within three months claimed by some other party than the person entering them, to deliver to such person a copy of the entry, with its proper number, and an order to the county surveyor to survey the land.    This order was called a warrant.    Upon it and the survey which followed a patent was issued.    If there were no entry, there could be no warrant, and of course no valid patent.    The ninth section declared that every right claimed by any person to lands which were not acquired in this mode, or by purchase or inheritance from parties who did so acquire them, or which were obtained in fraud or evasion of the provisions of the act, should be declared void.    In 1779 North Carolina ceded to the United States the territory in which the lands lie for which the patent to Sevier

was issued, reserving, however, to the State all existing rights, which were to be perfected according to its laws. The cession was accepted by Congress. The survey, upon which the patent to Sevier was issued, was made in 1795, and the plaintiff, to impeach the patent, offered, as already stated, to show that there had been no entry of the land in the office of the entry-taker of the county where it was situated, previous to the cession; that is, in substance, that the grantor had no authority to make the grant, the land having been previously conveyed to the United States. This offer was disallowed by the court below, and as judgment passed for the defendants, the case was brought to this court, where, as mentioned, the general doctrine as to the presumptions attending a patent, which we have stated, was declared, with the exceptions to it. Upon the general doctrine the court observed, speaking through Mr. Chief Justice Marshall, that the laws for the sale of the public lands provided many guards to secure the regularity of grants and to protect the incipient rights of individuals and of the State from imposition; that officers were appointed to superintend the business, and rules had been framed prescribing their duty; that these rules were in general directory, and when all the proceedings were completed by a patent issued by the authority of the State, a compliance with those rules was presupposed, and that "every prerequisite has been performed is an inference properly deducible, and which every man has a right to draw from the existence of the grant itself." "It would, therefore, be extremely unreasonable," said the court, "to avoid the grant in any court for irregularities in the conduct of those who are appointed by the government to supervise the progressive course of the title from its commencement to its consummation in a patent;" but there were some things so essential to the validity of a contract, that the great principles of justice and of law would be violated did there not exist some tribunal to which an injured party might appeal, and in which the means by which the elder title was acquired might be examined, and that a court of equity was a tribunal better adapted to this object than a court of law; and it added that "there are cases in which a grant is absolutely void; as where the State has no title to the thing granted, or where the

officer had no authority to issue the grant. In such cases the validity of the grant is necessarily examinable at law." So the court held that proof that no entry had been made in the office of the entry-taker in the county where the lands patented were situated, prior to the cession to the United States, was admissible under the ninth section ; for without such entry they would not be within the reservation mentioned in the act of cession. In other words, proof was admissible to show that the State had not retained control over the property, but had conveyed it to the United States.

In *Patterson* v. *Winn*, reported in 11th Wheaton, this case is cited, and, after stating what it decided, the court said : " We may, therefore, assume as the settled doctrine of this court, that if a patent is absolutely void upon its face, or the issuing thereof was without authority, or was prohibited by statute, or the State had no title, it could be impeached collaterally in a court of law in an action of ejectment, *but in general other objections and defects complained of must be put in issue in a regular course of pleading in a direct proceeding to avoid the patent.*"

The doctrine declared in these cases as to the presumptions attending a patent has been uniformly followed by this court. The exceptions mentioned have also been regarded as sound, although from the general language used some of them may require explanation to understand fully their import. If the patent, according to the doctrine, be absolutely void on its face, it may be collaterally impeached in a court of law. It is seldom, however, that the recitals of a patent will nullify its granting clause, as, for instance, that the land which it purports to convey is reserved from sale. Of course, should such inconsistency appear, the grant would fail. Something more, however, than an apparent contradiction in its terms is meant when we speak of a patent being void on its face. It is meant that the patent is seen to be invalid, either when read in the light of existing law, or by reason of what the court must take judicial notice of; as, for instance, that the land is reserved by statute from sale, or otherwise appropriated, or that the patent is for an unauthorized amount, or is executed by officers who are not intrusted by law with the power to issue grants of portions of the public domain.

So, also, according to the doctrine in the cases cited, if the patent be issued without authority, it may be collaterally impeached in a court of law. This exception is subject to the qualification, that when the authority depends upon the existence of particular facts, or upon the performance of certain antecedent acts, and it is the duty of the Land Department to ascertain whether the facts exist, or the acts have been performed, its determination is as conclusive of the existence of the authority against any collateral attack as is its determination upon any other matter properly submitted to its decision.

With these explanations of the exceptions, the doctrine of the cases cited may be taken as expressing the law accepted by this court since they were decided. *Hoofnagle* v. *Anderson*, 7 Wheat. 212; *Boardman* v. *Lessee of Reed*, 6 Pet. 328; *Bagnell* v. *Broderick*, 13 id. 436; *Johnson* v. *Towsley*, 13 Wall. 72; *Moore* v. *Robbins*, 96 U. S. 530.

In *Johnson* v. *Towsley* the court had occasion to consider under what circumstances the action of the Land Department in issuing patents was final, and after observing that it had found no support for the proposition offered in that case by counsel upon certain provisions of a statute, said, speaking by Mr. Justice Miller, that the argument for the finality of such action was " much stronger when founded on the general doctrine that when the law has confided to a special tribunal the authority to hear and determine certain matters arising in the course of its duties, the decision of that tribunal, within the scope of its authority, is conclusive upon all others." " That the action of the land-office," the court added, " in issuing a patent for any of the public land, subject to sale by pre-emption or otherwise, is conclusive of the legal title, must be admitted on the principle above stated, and in all courts and in all forms of judicial proceedings where this title must control, either by reason of the limited powers of the court or the essential character of the proceeding, no inquiry can be permitted under the circumstances under which it was obtained;" and then observed, that there exists in the courts of equity the power to correct mistakes and relieve against frauds and impositions; and that in cases where it was clear that the officers of the Land Department had by a mistake of the law given to

one man the land which, on the undisputed facts, belonged to another, to give proper relief. The doctrine thus stated was approved in the subsequent case of *Moore* v. *Robbins.*

The general doctrine declared may be stated in a different form, thus: A patent, in a court of law, is conclusive as to all matters properly determinable by the Land Department, when its action is within the scope of its authority, that is, when it has jurisdiction under the law to convey the land. In that court the patent is unassailable for mere errors of judgment. Indeed, the doctrine as to the regularity and validity of its acts, where it has jurisdiction, goes so far that if in any circumstances under existing law a patent would be held valid, it will be presumed that such circumstances existed. Thus, in *Minter* v. *Crommelin,* reported in 18th Howard, where it appeared that an act of Congress of 1815 had provided that no land reserved to a Creek warrior should be offered for sale by an officer of the Land Department unless specifically directed by the Secretary of the Treasury, and declared that if the Indian abandoned the reserved land it should become forfeited to the United States, a patent was issued for the land, which did not show that the Secretary had ordered it to be sold, and the court said: " The rule being that the patent is evidence that all previous steps had been regularly taken to justify making of the patent; and one of the necessary steps here being an order from the Secretary to the register to offer the land for sale because the warrior had abandoned it, we are bound to presume, that the order was given. That such is the effect, as evidence, of the patent produced by the plaintiffs was adjudged in the case of *Bagnell* v. *Broderick* (13 Pet. 436), and is not open to controversy anywhere, and the State court was mistaken in holding otherwise."

On the other hand, a patent may be collaterally impeached in any action, and its operation as a conveyance defeated, by showing that the department had no jurisdiction to dispose of the lands; that is, that the law did not provide for selling them, or that they had been reserved from sale or dedicated to special purposes, or had been previously transferred to others. In establishing any of these particulars the judgment of the department upon matters properly before it is not assailed, nor is

the regularity of its proceedings called into question; but its authority to act at all is denied, and shown never to have existed.

According to the doctrine thus expressed and the cases cited in its support, — and there are none in conflict with it, — there can be no doubt that the court below erred in admitting the record of the proceedings upon which the patent was issued, in order to impeach its validity. The judgment of the department upon their sufficiency was not, as already stated, open to contestation. If in issuing a patent its officers took mistaken views of the law, or drew erroneous conclusions from the evidence, or acted from imperfect views of their duty, or even from corrupt motives, a court of law can afford no remedy to a party alleging that he is thereby aggrieved. He must resort to a court of equity for relief, and even there his complaint cannot be heard unless he connect himself with the original source of title, so as to be able to aver that his rights are injuriously affected by the existence of the patent; and he must possess such equities as will control the legal title in the patentee's hands. *Boggs* v. *Merced Mining Co.*, 14 Cal. 279, 363. It does not lie in the mouth of a stranger to the title to complain of the act of the government with respect to it. If the government is dissatisfied, it can, on its own account, authorize proceedings to vacate the patent or limit its operation.

This doctrine as to the conclusiveness of a patent is not inconsistent with the right of the patentee, often recognized by this court, to show the date of the original proceeding for the acquisition of the title, where it is not stated in the instrument, as the patent is deemed to take effect by relation as of that date, so far as it is necessary to cut off intervening adverse claims. Thus, in a contest between two patentees for the same land, it may be shown that a junior patent was founded upon an earlier entry than an older patent, and therefore passes the title. Such evidence in no way trenches upon the ruling of the department upon matters pending before it. Nor is the doctrine of the conclusiveness of the patent inconsistent with the right of a party resisting it to show, if an entry is not stated in the instrument, that no entry of the land was made as an initiatory proceeding, where a statute, as was the case in

North Carolina, mentioned in *Polk's Lessee* v. *Wendell*, declares that proceedings for the title, when such entry has not been made, shall be adjudged invalid. A statute may in any case require proof of a fact which otherwise would be presumed. Except with reference to such anterior matters and others of like character, no one in a court of law can go behind the patent and call in question the validity of the proceedings upon which it is founded.

The case at bar, then, is reduced to the question whether the patent to Starr is void on its face; that is, whether, read in the light of existing law, it is seen to be invalid. It does not come within any of the exceptions mentioned in the cases cited. The lands it purports to convey are mineral, and were a part of the public domain. The law of Congress had provided for their sale. The proper officers of the Land Department supervised the proceedings. It bears the signature of the President, or rather of the officer authorized by law to place the President's signature to it, which is the same thing; it is properly countersigned, and the seal of the General Land-Office is attached to it. It is regular on its face, unless some limitation in the law, as to the extent of a mining claim which can be patented, has been disregarded. The case of the defendants rests on the correctness of their assertion that a patent cannot issue for a mining claim which embraces over one hundred and sixty acres. Assuming that the words "*more or less*," accompanying the statement of the acres contained in the claim, are to be disregarded, and that the patent is construed as for one hundred and sixty-four acres and a fraction of an acre, there is nothing in the acts of Congress which prohibits the issue of a patent for that amount. They are silent as to the extent of a mining claim. They speak of locations and limit the extent of mining ground which an individual or an association of individuals may embrace in one of them. There is nothing in the reason of the thing, or in the language of the acts, which prevents an individual from acquiring by purchase the ground located by others and adding it to his own. The difficulty with the court below, as seen in its charge, evidently arose from confounding "location" and "mining claim," as though the two terms always represent the same thing, whereas they

often mean very different things. A mining claim is a parcel of land containing precious metal in its soil or rock. A location is the act of appropriating such parcel, according to certain established rules. It usually consists in placing on the ground, in a conspicuous position, a notice setting forth the name of the locator, the fact that it is thus taken or located, with the requisite description of the extent and boundaries of the parcel, according to the local customs, or, since the statute of 1872, according to the provisions of that act. Rev. Stat., sect. 2324. The location, which is the act of taking the parcel of mineral land, in time became among the miners synonymous with the mining claim originally appropriated. So, now, if the miner has only the ground covered by one location, "his mining claim" and "location" are identical, and the two designations may be indiscriminately used to denote the same thing. But if by purchase he acquires the adjoining location of his neighbor, — that is, the ground which his neighbor has taken up, — and adds it to his own, then his mining claim covers the ground embraced by both locations, and henceforth he will speak of it as his claim. Indeed, his claim may include as many adjoining locations as he can purchase, and the ground covered by all will constitute what he claims for mining purposes, or, in other words, will constitute his mining claim, and be so designated. Such is the general understanding of miners and the meaning they attach to the term.

Previously to the act of July 9, 1870, Congress imposed no limitation to the area which might be included in the location of a placer claim. This, as well as every other thing relating to the acquisition and continued possession of a mining claim, was determined by rules and regulations established by miners themselves. Soon after the discovery of gold in California, as is well known, there was an immense immigration of gold-seekers into that Territory. They spread over the mineral regions and probed the earth in all directions in pursuit of the precious metals. Wherever they went they framed rules prescribing the conditions upon which mining ground might be taken up, in other words, mining claims be located and their continued possession secured. Those rules were so framed as to give to all immigrants absolute equality of right and privi-

lege. The extent of ground which each might locate, that is, appropriate to himself, was limited so that all might, in the homely and expressive language of the day, have an equal chance in the struggle for the wealth there buried in the earth. But a few months' experience in the precarious and toilsome pursuit drove great numbers of the miners to seek other means of livelihood and fortune, and they therefore disposed of their claims. They never doubted that their rights could be transferred so that the purchaser would hold the claims by an equally good title. Their transferable character was always recognized by the local courts, and the title of the grantee enforced. Many individuals thus became the possessors of claims covering ground taken up by different locations, and the amount which each person or an association of persons might acquire and hold was only limited by his or their means of purchase.

The rules and regulations originally established in California have in their general features been adopted throughout all the mining regions of the United States. They were so wisely framed and were so just and fair in their operation that they have not to any great extent been interfered with by legislation, either state or national. In the first mining statute, passed July 9, 1866, they received the recognition and sanction of Congress, as they had previously the legislative and judicial approval of the States and Territories in which mines of gold and silver were found. That act declared, and the declaration was repeated in a subsequent statute, that the mineral lands of the public domain were free and open to occupation and exploration by all citizens of the United States, and by those who had declared their intention to become such, subject to such regulations as might be prescribed by law, and subject, also, " to the local customs or rules of miners of the several mining districts," so far as the same were not in conflict with the laws of the United States. It authorized the issue of patents for claims on veins or lodes of quartz or other "rock in place" bearing gold, silver, cinnabar, or copper. Placer claims first became the subject of regulation by the mining act of July 9, 1870, c. 235 (16 Stat. 217), which provided that patents for them might be issued under like cir-

cumstances and conditions as for vein or lode claims, and that persons having contiguous claims of *any size* might make joint entry thereof. But it also provided that no location of a placer claim thereafter made should exceed one hundred and sixty acres for one person or an association of persons. The mining act of May 10, 1872, c. 152 (17 id. 91), declared that a location of a placer claim subsequently made should not include more than twenty acres for each individual claimant. These are all the provisions touching the extent of locations of placer claims, and they are re-enacted in the Revised Statutes. Sects. 2330, 2331. A limitation is not put upon the sale of the ground located, nor upon the number of locations which may be acquired by purchase, nor upon the number which may be included in a patent. Every interest in lands is the subject of sale and transfer, unless prohibited by statute, and no words allowing it are necessary. In the mining statutes numerous provisions assume and recognize the salable character of one's interest in a mining claim. Sect. 13 of the act of 1870 declares that where a person or association or *their grantors* have held and worked claims for a period equal to the time prescribed by the Statute of Limitations of the State or Territory where the same is situated, evidence of such possession and working shall be sufficient to establish the right to a patent. Sect. 5 of the act of 1872, rendering a mining claim subject to relocation where certain conditions of improvement or expenditure have not been made, has a proviso that the original locators, "*their heirs, assigns, or legal representatives,* have not resumed work upon the claim after such failure and before such location." These provisions are of themselves conclusive that the locator's interest in a mining grant is salable and transferable, even were there any doubt on the subject, in the absence of express statutory prohibition. Those of the act of 1870 are also conclusive of the right of the purchaser of claims to a patent, for it is with reference to it that the derivative right by purchase or assignment is mentioned. Rev. Stat., sects. 2332, 2334.

In addition to all this, it is difficult to perceive what object would be gained, what policy subserved, by a prohibition to embrace in one patent contiguous mining ground taken up by

different locations and subsequently purchased and held by one individual. He can hold as many locations as he can purchase, and rely upon his possessory title. He is protected thereunder as completely as if he held a patent for them subject to the condition of certain annual expenditures upon them in labor or improvements. If he wishes, however, to obtain a patent, he must, in addition to other things, pay the government a fee of five dollars an acre, a sum that would not be increased if a separate patent were issued for each location.

The decision of this court upon one point in the case of *Polk's Lessees* v. *Wendell*, already cited, is directly applicable here. The patent to the defendants in that case was for twenty-five thousand acres of land, and one of the objections taken was that it was void because the statute of North Carolina limited an entry of one person to five thousand acres. But the statute declared that where two or more persons had entered, or should afterwards enter, lands jointly, or where two or more persons agreed to have their entries surveyed jointly in one or more surveys, the surveyor should survey the same accordingly in one entire survey. It was contended that as the statute provided for entries made by two or more persons it could not be extended to the case of distinct entries belonging to the same person. To this the court replied as follows: "For this distinction it is impossible to conceive a reason. No motive can be imagined for allowing two or more persons to unite their entries in one survey which does not apply with at least as much force for allowing a single person to unite his entries, *adjoining each other*, in one survey. It appears to the court that the case comes completely within the spirit, and is not opposed by the letter, of the law. The case provided for is ' where two or more persons agree to have their entries surveyed jointly,' &c. Now this does not prevent the subsequent assignment of the entries to one of the parties; and the assignment is itself the agreement of the assignor that the assignee may survey the entries jointly or severally, at his election. The court is of opinion that, under a sound construction of this law, entries, which might be joined in one survey, if remaining the property of two or more persons, may be joined, though they become the property of a single person." The objection

to the patent by reason of its embracing over five thousand acres was accordingly overruled.

By a provision of the mining act of 1870, still in force, two or more persons, or association of persons, having contiguous claims *of any size*, are allowed to make a joint entry thereof. Rev. Stat., sect. 2330. If one individual should acquire all such contiguous claims by purchase, no sound reason can be suggested why he should not be equally entitled to enter them all by one entry as when they were held by the original parties. To quote the language of the case cited, " No motive can be imagined for allowing two or more persons to unite their entries in one survey which does not apply with at least as much force for allowing a single person to unite his entries adjoining each other in one survey."

The last position of the court below, that the owner of contiguous locations who seeks a patent must present a separate application for each, and obtain a separate survey, and prove that upon each the required work has been performed, is as untenable as the rulings already considered. The object in allowing patents is to vest the fee in the miner, and thus encourage the construction of permanent works for the development of the mineral resources of the country. Requiring a separate application for each location, with a separate survey and notice, where several adjoining each other are held by the same individual, would confer no benefit beyond that accruing to the land-officers from an increase of their fees. The public would derive no advantage from it, and the owner would be subjected to onerous and often ruinous burdens. The services of an attorney are usually retained when a patent is sought, and the expenses attendant upon the proceeding are in many instances very great. To lessen these as much as possible the practice has been common for miners to consolidate, by conveyance to a single person or an association or company, many contiguous claims into one, for which only one application is made, and of which only one survey is had. Long before patents were allowed — indeed, from the earliest period in which mining for gold and silver was pursued as a business — miners were in the habit of consolidating adjoining claims, whether they consisted of one or more original loca-

tions, into one, for convenience and economy in working them. It was, therefore, very natural, when patents were allowed, that the practice of presenting a single application with one survey of the whole tract should prevail. It was at the outset, and has ever since been, approved by the department, and its propriety has never before been questioned. Patents, we are informed, for mining ground of the value of many millions of dollars, have been issued upon consolidated claims, nearly all of which would be invalidated if the positions assumed by the defendants could be sustained.

It was urged on the argument that a patent for each location was required to prevent a monopoly of mining ground, — to prevent, to use the language of counsel, the public domain from being "monopolized by speculators." The law limiting the extent of mining lands which an individual may locate has provided, so far as it was deemed wise, against an accumulation of them in one person's hands. It could not have prohibited the sale of the location of an individual without imposing a restriction injurious to his interests, and in many instances destructive of the whole value of his claim. Every one, at all familiar with our mineral regions, knows that the great majority of claims, whether on lodes or on placers, can be worked advantageously only by a combination among the miners, or by a consolidation of their claims through incorporated companies. Water is essential for the working of mines, and in many instances can be obtained only from great distances, by means of canals, flumes, and aqueducts, requiring for their construction enormous expenditures of money, entirely beyond the means of a single individual. Often, too, for the development of claims, streams must be turned from their beds, dams built, shafts sunk at great depth, and flumes constructed to carry away the débris of the mine. Indeed, successful mining, whether on lode claims or placer claims, can seldom be prosecuted without an amount of capital beyond the means of the individual miner.

There is no force in the suggestion that a separate patent for each location is necessary to insure the required expenditure of labor upon it. The statute of 1872 provides that on each claim subsequently located, until a patent is issued for it,

there shall be annually expended in labor or improvements one hundred dollars; and on claims previously located an annual expenditure of ten dollars for each one hundred feet in length along the vein; but where such claims are held "in common," the expenditure may be upon any one claim. As these provisions relate to expenditures before a patent is issued, proof of them will be a matter for consideration when application for the patent is made. It is not perceived in what way this proof can be changed or the requirement affected, whether the application be for a patent for one claim or for several claims held in common. Labor and improvements, within the meaning of the statute, are deemed to have been had on a mining claim, whether it consists of one location or several, when the labor is performed or the improvements are made for its development, that is, to facilitate the extraction of the metals it may contain, though in fact such labor and improvements may be on ground which originally constituted only one of the locations, as in sinking a shaft, or be at a distance from the claim itself, as where the labor is performed for the turning of a stream, or the introduction of water, or where the improvement consists in the construction of a flume to carry off the débris or waste material. It would be absurd to require a shaft to be sunk on each location in a consolidated claim, when one shaft would suffice for all the locations; and yet that is seriously argued by counsel, and must be maintained to uphold the judgment below.

The statutes provide numerous guards against the evasion of their provisions by parties seeking a mining patent, and afford an opportunity to persons in the neighborhood of the claim to come forward and present any objections they may have to the granting of the patent desired. By sects. 6 and 7 of the act of 1872, which constitute sects. 2325 and 2326 of the Revised Statutes, the procedure which a party seeking a patent, whether an individual or an association or a corporation, must follow is prescribed: —

1st, The party must file an application in the proper land-office under oath, showing a compliance with the law, together with a plat and the field-notes of the claim, or "claims in common," made by or under the direction of the Surveyor-General

of the United States, showing the boundaries of the claim or claims, which must be distinctly marked by monuments on the ground.

2d, Previously, however, to the filing of the application, the claimant must post a copy of the plat, with a notice of his intended application, in a conspicuous place on the land embraced in it, and file an affidavit of at least two persons that such notice has been duly posted with a copy of the notice in the land-office.

3d, When such application, plat, field-notes, notice, and affidavits have been filed, the register of the land-office is required to publish a notice of the application for the period of sixty days, in a newspaper, to be designated by him, nearest to the claim, and post such notice in his office for the same period,

4th, The claimant, at the time of filing his application, or at any time thereafter within sixty days, is required to file with the register a certificate of the United States Surveyor-General, that five hundred dollars' worth of labor has been expended, or improvements to that amount have been made upon the claim by himself or grantors; that the plat is correct, with such further description, by reference to natural objects or permanent monuments, as shall identify the claim, and furnish an accurate description to be incorporated in the patent.

5th, At the expiration of sixty days the claimant is required to file his affidavit showing that the plat and notice have been posted in a conspicuous place on the claim during the period of publication. If no adverse claim shall have been filed with the register and receiver of the proper land-office within the sixty days of publication, it is then to be assumed that the applicant is entitled to a patent upon the payment to the proper officer of five dollars per acre, and that no adverse claim exists.

6th, The statute then proceeds to declare that if an adverse claim is filed during the period of publication, it must be upon the oath of the party making it, and must show the nature, boundaries, and extent of such adverse claim; and all proceedings, except the publication of the notice and the making and filing of the affidavit, shall be thereupon stayed until the controversy shall have been settled by a decision of a court of competent jurisdiction, or the adverse claim waived. And it

is made the duty of the adverse claimant, within thirty days after filing his claim, to commence proceedings in a court of competent jurisdiction to determine the question of the right of possession, and to prosecute the same with reasonable diligence to final judgment; and a failure to do so is to be deemed a waiver of his adverse claim. After judgment has been rendered in such proceedings, the party entitled to the possession of the claim, or any portion of it, may file a certified copy of the judgment-roll with the register of the land-office, together with a certificate of the Surveyor-General that the requisite amount of labor has been expended or improvements made thereon, and the description required in other cases; and must pay to the receiver five dollars an acre for his claim, together with the proper fees; and then the whole proceedings and the judgment-roll are to be certified by the register to the Commissioner of the General Land-Office, and a patent thereupon issued for the claim, or such portion thereof as the applicant, by the decision of the court, shall appear to be entitled to.

It will thus be seen that if an adverse claim is made to the mining ground for which a patent is sought, its validity must be determined by a local court, unless it be waived, before a patent can be issued. There would seem, therefore, to be more cogent reasons, in cases where a patent for such ground is relied upon, to maintain the doctrine which we have declared, that it cannot be assailed in a collateral proceeding, than in the case of a patent for agricultural land.

But it is unnecessary to pursue the subject further. The judgment of the court below must be reversed and the cause remanded for a new trial; and it is

*So ordered.*

MR. JUSTICE MILLER and MR. JUSTICE HARLAN dissented.

NOTE. — *Smelting Company* v. *Ray*, error to the Circuit Court of the United States for the District of Colorado, was argued at the same time as the preceding case, and by the same counsel for the plaintiff in error, and by *Mr. Thomas M. Patterson* for the defendants in error.

MR. JUSTICE FIELD remarked that, as it presented the same questions there determined, the judgment of the court below must be reversed and the cause remanded for a new trial.

MR. JUSTICE MILLER and MR. JUSTICE HARLAN dissented.