BUNKER HILL & S. MINING & CONCENTRATING CO. v. EMPIRE STATE IDAHO MINING & DEVELOPING CO. et al.

(Circuit Court, D. Idaho, N. D. May 4, 1900.)

No. 138.

1. MINING CLAIMS—PRIORITY OF LOCATION—EFFECT OF PATENT.

A patent for a mining claim is not conclusive as to the date of location, such fact not being one which it is essential for the land office to determine in issuing the patent; hence the failure of the owner of an adjoining claim, where the two overlap, to contest the application, is not an admission on his part of the priority of location of the patented claim which concludes him and debars him from thereafter contesting the question in the courts.

2. SAME—OVERLAPPING CLAIMS—LIMIT OF UNDERGROUND RIGHTS.

The law contains nothing granting, under any circumstances, to a claim owner, a greater length of the discovered ledge underground than he owns of its apex; hence where two claims overlap along the apex of a ledge, although the end lines of the senior location converge, and meet within the other claim, so as to terminate the rights of its owner at that point, the owner of the junior claim cannot take up the ledge in its downward course beyond such point, and continue to follow it within the limits of his own end lines. but his underground ownership of the ledge is bounded by the extension of the plane passing through the line of the senior claim, which bounds his rights along the apex, where such line and his own end line, which marks his other boundary, converge in the direction of the dip of the vein.

3. SAME.

Ledges may be followed between the end-line planes of a claim without any limitation as to their dip or course.

At Law. Action to determine mining rights.

Lindley & Eickhoff, John R. McBride, Albert Allen, and J. H. Forney, for plaintiff.

Heyburn, Price, Heyburn & Doherty, for defendants.

BEATTY, District Judge. The question involved in this action is the right of possession of or title to an underground portion of a mineral-bearing ledge, which is claimed by plaintiff through its own-

ership of the Stemwinder mining claim, and by defendants through their ownership of the Last Chance and Emma mining claims. It involves the settlement of an underground mining conflict based upon surface rights. The mining law, as authoritatively interpreted, proves in many cases most cruel to important mining interests. Priority has become the chief element of value in a mining location. However carefully a junior locator may lay his lines upon the public domain so as to carve therefrom. a mining claim in exact conformity to the law, he may nevertheless find himself robbed of what the law pretends to grant him by some senior locator, who, however carelessly he may have made his location, by accident, rather than by foresight, happens to have the ledge crossing two of his boundary planes, between which he follows it regardless of dip, strike, and all junior locators. It is often most painful to enforce such a law, but, as it is, it must be followed until changed. It is remarkable that there seems to be no effort made for its improvement, which might so easily be done. In the trial of the cause many questions have been presented, which, with the facts concerning them, will be stated as considered. The following diagram shows the relative position of the mining locations as now claimed by the respective owners. The underground portion of the ledge in controversy lies within the planes extended westerly, passing through the claimed end lines of the Stemwinder,—the lines a—b and c—d.

The important question is that of priority of location. As between the Stemwinder and Emma it is by judicial determination conclusively settled in favor of the Emma. Defendants also claim a like conclusive determination, fixing the date of location of the Last Chance on September 17, 1885, in an action between the Last Chance and Tyler Mining Companies; but, as neither the title of the Stemwinder nor the interests of its owners therein were in any way involved in that suit, the defendants' claim cannot be admitted. The location notices of the Stemwinder and Last Chance are each dated September 17, 1885; but Divine, the locator of the Stemwinder, says he made a mistake in the date, and it should have been the 18th. While the witnesses identified the particular

day of location, they differ as to whether it was the 17th or 18th. The testimony shows that, on the day prior to the location of the Stemwinder, Divine and three of the Last Chance locators—Flaherty, Smith, and Carlin—were in the country several miles east of the locality of these claims, and in the evening of that day they met in camp on Jackass prairie, about two to three miles northerly from such locality. They had heard of the location of the Bunker Hill, which lies next south of the Stemwinder, and Carlin reported that he had found it. The next morning all these parties repaired to that neighborhood, and Divine discovered and located the Stemwinder, and, as he claims, before the other parties had discovered the Last Chance. He also claims that as late as the 20th he passed over the ground of the Last Chance; that no location of it had been made; that he was at the tree on which he subsequently saw the notice, and that then there was no notice on it. On that date—the 20th—he located the Tyler, and, while he says the ground now covered by the Last Chance, and lying between the Stemwinder and Tyler, was vacant, and while he must then have known, or at least had strong reason to believe, the ledge passed through it, he did not locate it, but left sufficient space between his two claims for the Last Chance,—a fact strongly suggesting that it had already been located. In addition to Divine's detail of the movements of the parties, which indicate that he was on the Stemwinder ground before they were on the Last Chance, and his direct statement of his prior location, the facts that, when he found a Last Chance stake on his ground, he protested until they removed it,—which Smith admits was done,—and that the Last Chance lies further up the hill than the Stemwinder, have some tendency towards the conclusion that the Stemwinder was the first located.

Smith, one of the Last Chance locators, says that on the day they came from Jackass prairie—which he says was the 17th—the four named parties went up the hill where these claims are; that he went down into the gulch, leaving the others on the hill; that in about an hour Flaherty and Carlin came down, saying that Divine had located the Stemwinder, and that they wanted two notices written for the Emma and Last Chance; that the notice of the Emma referred to it as lying north of and adjoining the Stemwinder, and that of the Last Chance as lying north of and adjoining the Emma; but says that, instead of putting up these notices immediately, they were not posted until the 19th. His testimony is a clear admission that the Stemwinder was first located, but that all were discovered on the same day, which he says was the 17th, and not the 18th, as Divine says. The defendants criticise Smith's testimony, alleging that he had recent trouble with the owners of the Last Chance; but a comparison of his present testimony with that given by him in a former case involving the date of the Last Chance location does not suggest any material change in his testimony. The testimony of Carlin given in a trial between the Last Chance and Tyler was introduced, but it was in relation to the relative date of the Last Chance and Tyler, and throws but little light upon the exact time when the Stemwinder was located. My impression from

all the testimony is that both the Last Chance and Stemwinder were discovered on the same day, and at nearly the same time, but that the Stemwinder was prior in discovery and location. Considering the movements of these prospectors, and the fact that the Last Chance locators were in the country at least a day before Divine, it is possible that they may have been on the Last Chance ground before Divine located the Stemwinder. While the preponderance of the testimony seems to be in favor of the priority of the Stemwinder, yet, all the circumstances considered, there is reason for doubt. It is therefore hoped that the reviewing court may find it consistent to disregard the usual rule of following the findings of fact adopted by the trial court, and examine the testimony independent of this conclusion.

Does the granting of the patent conclusively fix the date of location of the Last Chance claim as at the time named in the location notice? The view that it should is not without reasonable support. The location notice is a necessary paper in the patent proceedings. We cannot imagine a valid notice without a date. The date then appears in the proceedings. It is generally placed on the posted notice, but, even if not published or posted, it can be known by an examination in the land office. It seems to me that the existence of a notice, and the date of it, is as much a fact to be settled by the land department in issuing a patent as any fact connected with the application. There may be a few cases in which this rule would work a hardship upon adjoining claimants, but there are many more in which the hardship to the patentee is greater. If the question of date is forever left open, his patent in this most important particular is but a snare to him. He may at any time be called upon to prove his title, and often after the witnesses are dead, and the means of proof are lost. The law, in granting a patent, intends to change the unstable possessory title into one fixed and unassailable. Although Justice Field in the Eureka Case said that it "is something upon which its holder can rely for peace and security," and that "in its potency it is ironclad," yet it does not seem that all questions connected with the patent record are yet conclusively settled by judicial decision, and among them is that of the date of location of the patented claim. In Smelting Co. v. Kemp, 104 U. S. 640, 641, 26 L. Ed. 875, the court says that the officers of the land department are authorized to settle matters of fact in patent applications, that their action in such matters is in its nature judicial, that "their judgment as to matters of fact properly determinable by them is conclusive," and "that all requirements preliminary to its issue have been complied with," besides referring to the hardship on the patentee of submitting the same question to successive juries, and discussing the unassailable character of the patent; but the question of what those "matters of fact" and "requirements preliminary" are is left undefined, and remains the subject of conjecture and contention. In the Eureka Case, 4 Sawy. 317, Fed. Cas. No. 4,548, the argument tends to support the view that the patent establishes the date of location, and beyond question so, when the date is named in the patent itself.

However, these cases do not settle the question, but, so far as this court is concerned, the circuit court of appeals of this circuit in Last Chance Min. Co. v. Tyler Min. Co., 61 Fed. 557, 9 C. C. A. 613, has determined it. In that case this same question as to the same Last Chance mining claim was involved. The court says: "But it [the patent] does not fix the time the location was made. In order to determine this question, it is necessary to introduce evidence independent of the patent." It is therefore held that the issue of the Last Chance patent does not conclusively fix the date of location. The Stemwinder and Last Chance claims as located had a surface conflict, notwithstanding which the Stemwinder did not protest the application for patent to the Last Chance. Whether this omission was an admission by the Stemwinder of the priority of location of the Last Chance is the question most earnestly discussed by counsel. It is contended, and with much reason, that the proceedings in the land office for a patent are equivalent to a judicial proceeding against all the world. The law requires such particularity of statement of what is claimed by the applicant, and such lengthy notice thereof, both by publication in public print and by the posting of notice on the claim, that it would seem that all may have ample notice of what is claimed; and it also directs that, if objection is not duly made, all parties are thereafter barred from making any objection to the issue of the patent. It is claimed that because of the surface conflict between the two claims the application for patent for the Last Chance was equivalent to an action against the Stemwinder with service of summons, that the failure of the Stemwinder to enter its objection and contest the application is equivalent to a default in an action in court, and that the land office is a court invested with judicial functions for this special kind of action. Certainly it is well settled that "a judgment by default is just as conclusive an adjudication between parties of whatever is essential to support the judgment as one rendered after answer and contest." Last Chance Min. Co. v. Tyler Min. Co., 157 U. S. 691, 15 Sup. Ct. 733, 39 L. Ed. 859. But, even considering the failure of the Stemwinder to object to the Last Chance application for patent as equivalent to a default in an action, the question still remains as to what facts are essential to support the judgment of the land department in issuing the patent. Is the date of location one of those essential facts? I think the authority is that it is not. In the case last cited there are some holdings bearing upon the question of res adjudicata that seem to be a guide here. On page 687, 157 U. S., page 735, 15 Sup. Ct., and on page 862, 39 L. Ed., the court says: "The particular matter in controversy in the adverse suit was the triangular piece of ground, which is not the matter in dispute in this action. The judgment in that case is therefore not conclusive in this as to matters which might have been decided, but only as to matters which were in fact decided." Again it says, "The question, then, is, what was in fact decided in that action"? It held and showed by the pleadings that the date of location of the Last Chance was specially put in issue, and was considered and decided. In the proceedings for the Last

Chance patent it cannot be said that such date was more than inferentially included in the pleadings or conclusion, and certainly it was not directly decided. Upon the question of priority, both as to facts and the law, which this court must follow, the conclusion is that the Stemwinder location is prior to the Last Chance.

The question of the underground rights of the Stemwinder remains for consideration. After the location of the Last Chance the Stemwinder location was so amended that its north boundary line in running east bore more to the north than the original north line, but it is made to appear by one of the illustrations, by plaintiff's counsel, that the point of convergence of these two lines is so without the limits of the Last Chance as that it is not affected by the change. While there can be no question of the right of the Stemwinder to amend its notice and location, it cannot do so to the detriment of an intervening locator. But neither the original nor amended north line of the Stemwinder is the line of separation between the rights of the parties in this case. Neither is the south line of the Last Chance the separating plane, for the reason that the Last Chance is the junior claim. It is conceded that defendants own also the Emma claim, which has been adjudicated as prior to the Stemwinder, and therefore owns that part of the apex of the ledge within its boundaries. The south line of the Emma does not continue to the east quite to the east boundary of the Stemwinder, but it does continue in that direction beyond the limits of the ledge. The Stemwinder, then, so far as concerns the Last Chance, owns the apex of the ledge to its north line; but as to the Emma, it owns it only to the Emma south line. If the lines of the Emma were so laid that this south line could be prolonged indefinitely, there can be no question that it would form the dividing line between the Emma and Stemwinder; but the Emma's legal end lines so converge that they meet at the point designated on the above plat by the letter X, beyond which to the westward the Emma cannot follow the ledge. Can the Stemwinder take up the ledge in its downward course where the Emma loses it, and continue to follow it within the limits of its north line? If so, then it would own more along the course of the ledge beneath the surface than it owns on the surface or of the apex. In a few cases, in consequence of the peculiar facts, the law has been so construed that less in length of the ledge is held beneath the surface than is owned of the apex; but in the Del Monte Case, 171 U. S. 88–91, 18 Sup. Ct. 895, 43 L. Ed. 72, the supreme court argues to the contrary, and it certainly is the clear design of the law that the lineal ownership of the ledge is the same under as upon the surface. There is nothing in the law granting, under any circumstances, the owner of the discovered ledge more under ground than he owns of the apex. On the contrary, there are provisions to guard against this. As the case of Walrath v. Mining Co., 171 U. S. 293, 18 Sup. Ct. 909, 43 L. Ed. 170, is understood, the court did give a locator more of the ledge under ground than he owned of its apex; but this was not concerning the primary vein, or the one upon which the location was based, but was of a secondary vein, which was unknown when the

location was made, and constituted no function in forming the lines of the claim. The court, on page 308, says: "These propositions we affirm, with the addition that the end lines of the original vein shall be the end lines of all the veins found within the surface boundaries." This, however, has never been held by any court concerning the discovery vein. My conclusion is that the Stemwinder owns only so much of the apex of the ledge measured along its center as lies between its south line as originally located and the south line of the Emma, and that in following the ledge on its downward course it must be between the prolongation of the planes passing through these lines which would end at their point of convergence indicated upon the plat by the letter Y. There is another view which might be taken of the Stemwinder's right; that is, that its south boundary line should be considered established, and that another line parallel to it should be established at the point where its ledge passes into the Emma; as was done by the supreme court in the Del Monte Case, supra. This rule cannot be followed here because of the priority of the Emma.

Defendants claim that the planes of the Stemwinder's end lines run more along the course than upon the dip of the ledge, and refer to the fact that this court once instructed a jury that this could not be done. Such instruction was given in the hurry of a jury trial, perhaps without sufficient reflection, and the court may also have been somewhat biased by the still lingering view always entertained by the miner that ledges were to be followed upon their dip; but I think the instruction was not in accord with the rule of the supreme court, which is simply that ledges are to be followed between end-line planes without any limitation prescribed as to dip or course. Following the logic of that rule, I have not examined the evidence bearing upon the relation of the Stemwinder's end lines to the course or dip of the ledge.

The defendant Last Chance Company claims to have held for over five years open, notorious, and adverse possession of the disputed premises, and that under the laws of Idaho it has a perfect title. I do not think the testimony shows such possession as is contemplated by the Idaho statute to confer title.

While other questions have been referred to, those controlling have been above disposed of. The conclusion therefore is that plaintiff have judgment for so much of the premises in dispute as lies within the triangular space bounded by the perpendicular planes prolonged westerly passing through the south line of the Last Chance, the south line of the Emma, and the original south line of the Stemwinder, and indicated approximately upon the above plat by the triangle Z, Y, X.