LOCKHARD et al. v. ASHER LUMBER CO. et al.

(Circuit Court, E. D. Kentucky. March 9, 1903.)

1. STATE LANDS—VALIDITY OF PATENT—KENTUCKY STATUTE.
Rev. St. Ky. 1852, c. 102, which went into effect July 1, 1852, and remained in force until December 1, 1873, prescribed the method of obtaining title to the public lands of the state from the counties to which they had been previously donated, which was by purchasing an order from the county court authorizing the entry and survey of a tract, which could not exceed 200 acres, making entry of a description of such order in the surveyor's book, causing a survey to be made by the surveyor, who was required to survey each entry in turn and to make a plat and certificate, which, with the order, must be filed with the register, and the issuance of a patent thereon. *Held*, that such act did not authorize the uniting of two or more entries in one survey, one purpose of limiting the orders to 200 acres each being to require surveys in small tracts, to avoid the danger of overlapping or of inclosing smaller grants, and that a patent for a larger quantity of land than 200 acres, which shows but a single survey, is without authority of law and void on its face, and may be collaterally impeached.

2. FEDERAL COURTS—FOLLOWING STATE DECISIONS—DICTA.
While a federal court is bound by the decisions of the highest court of a state construing a state statute, an expression of opinion by such court upon a question not involved in the ascertainment of the right or title in question between the parties, and which is therefore merely a dictum, is not a decision; and, where the question is directly presented to a federal court, it is bound to exercise its independent judgment thereon.

3. PATENT FOR LANDS—COLLATERAL ATTACK.
Where a complainant is seeking affirmative relief, based upon a patent to land, defendant may attack the validity of such patent by demurrer, on the ground that it is void on its face, without first showing that he has an interest in the land.

In Equity. Suit to quiet title. On demurrers to bill.

Holt & Alexander and Morris & Newberger, for plaintiffs.

Beckner & Jouett, W. B. Dixon, J. H. Tinsley, and Breckinridge & Shelby, for defendants.

COCHRAN, District Judge. This is a suit in equity to quiet the title to a tract of land in Harlan county, Ky., containing 40,400 acres. The plaintiffs' claim thereto is based upon a patent issued November 4, 1873, to C. O. Lockhard, their devisor. It is set forth in the bill and filed as an exhibit therewith.* Certain of the defendants have demurred, and certain others have answered, and to a portion of the answers the plaintiffs have filed exceptions. The ground of demurrer is also relied on in said portion of the answers, so that the demurrers and exceptions raise the same questions.

¶ 2. State laws as rules of decision in federal courts, see notes to Spokane Falls & N. Ry. Co. v. Ziegler, 9 C. C. A. 548; Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.

¶ 3. Decisions of land department, their conclusiveness and effect, see notes to Hartman v. Warren, 22 C. C. A. 38; Carson City Gold & Silver Min. Co. v. North Star Min. Co., 28 C. C. A. 344.

* The patent gives a boundary of 78,262 acres, and excepts therefrom 37,862 acres theretofore patented without description thereof, leaving 40,400 acres as the quantity of land covered by the patent.

The ground of demurrer is that the vacant land statute of Kentucky, in existence when said patent was issued, did not authorize the issuance of a patent for a greater quantity of such land than 200 acres, and, as an inspection of said patent shows that it covers a much larger quantity, it is void on its face, and plaintiffs' devisor acquired no title thereunder. That statute was chapter 102, p. 430, of the Revised Statutes of Kentucky, which took effect July 1, 1852, and continued in force, save as affected by subsequent amendments, until December 1, 1873, a few days after the issuance of said patent, when the General Statutes went into effect. Section 3 thereof is in these words:

"Any person who wishes to appropriate any vacant and unappropriated lands may, on application to the county court of the county in which the same lies, and paying at such price as the court may allow, not less than five dollars per hundred acres therefor, obtain an order of court authorizing him to enter and survey any number of acres of such land in the county, not less than twenty-five nor more than two hundred.

"(1) The party obtaining such order may, by an entry in the surveyor's book of the county, describing the same, appropriate the quantity of land it calls for in one or more parcels, as he may think proper.

"(2) The surveyor shall survey the entries in the succession in which the same are made, bounding the same by plainly marked trees, stones, or stakes, noting where it binds on a water course, or the marked line of another survey, giving names. It shall be made in the presence of two disinterested housekeepers as chainmen, whose names must be placed at the bottom of the plat and certificate.

"(3) Such survey must be made within two months from and after the date of the entry.

"(4) A plat and certificate of the survey must be made out by the surveyor and recorded in his books, and the original thereof, and a copy of the order of court under which it is made, must be deposited in the register's office within four months after the survey is made.

"(5) A patent may issue on the survey within three months after a plat and certificate thereof and a copy of the order are filed in the register's office.

"(6) When a survey has been carried into grant, the register shall write across the face of the order on which the survey was made, 'Satisfied,' and sign his name thereto.

"(7) The legal title of the land shall bear date from the time of making the survey.

"(8) None but vacant land shall be subject to appropriation under this chapter. Every entry, survey, or patent, made or issued under this chapter, shall be void so far as it embraces lands previously entered, surveyed or patented.

"(9) A plat and certificate of survey shall be assignable, and the assignment thereof shall authorize a patent to issue thereon to the assignee.

"(10) The register may receive plats and certificates of survey after the expiration of the time herein allowed for returning the same; but, in such case, the legal title shall take effect only from the date of the patent.

"(11) No land shall be subject to appropriation under this chapter that has reverted to the commonwealth by escheat, or has been forfeited for an omission to list the same for taxation, or for failing to pay the taxes thereon, or which has been once patented and the title of the same has in any way become again vested in the commonwealth."

None of the amendments to said section have any bearing on defendants' said claim, except in so far as they may aid in the proper interpretation of the relevant portions thereof. Said section prescribed a gradual process, consisting of four separate and distinct stages, by which one desiring to acquire title to vacant land in any of the counties of the state might do so. Those stages were: An order

of the county court of the county in which the land lay, entered of record, authorizing the entry and survey thereof, purchased by said person from said court; an entry of a description of said order in the surveyor's book of the county; a survey by the surveyor, a plat and certificate thereof to be prepared by him and thereafter deposited, with a copy of said order, in the register's office; and a patent. In short, the order was the initial stage; the entry and survey were intermediate stages, and the patent was the final stage. With the order, said person acquired a valid claim to vacant land, which, as it passed through the intermediate stages, into the final one, grew in intensity. The order was a float, the entry an appropriation or segregation, the survey a delimitation, and the patent a conveyance. At its initiation such a claim was limited in extent. It could not exceed 200 acres of such land, for it was expressly provided that an order could be obtained for only such quantity; and the question which defendants' contention, that under said statute a patent could not issue for a greater quantity, presents is whether it was possible thereunder for a claim to vacant land, as it passed through these various stages, to grow extensively, as well as intensively. It is certain that it could not so grow in entering upon the first intermediate stage, to wit, the entry; for the entry was but a description of the order, and amounted only to an appropriation of the quantity of land which it called for. If it could so grow at all, it must have been as it entered upon the second intermediate stage, the survey, or the final stage, the patent; and it could only so grow there by the union of two or more entries in one survey, or two or more surveys in one patent. So that the question involved in defendants' contention, when we get to the bottom of the matter, is whether or not the statute authorized the union of two or more entries in one survey, or two or more surveys in one patent. It is certain that it did not authorize such a union of two or more entries, or of two or more surveys, when held by different persons. If it authorized any union at all, it was only a union of two or more entries, or of two or more surveys, when held by one person. It is certain, further, that it did not expressly authorize either of said unions. If it authorized either at all, it did so impliedly.

First, then, as to whether the statute impliedly authorized the union of two or more entries, when held by one person, in one survey. This question presupposes that it authorized one person to acquire two or more entries which could be so united. Of this, however, there is, on the merits of the question, at least, some doubt. If such authority existed, it, too, was an implied, and not an express, one; and the sole ground for implying it was that there was no express prohibition against it. This, perhaps, was sufficient ground therefor, unless there is something in the letter of the statute, or the object which the Legislature intended to accomplish by some provision thereof, to indicate an intention on its part that such authority should not exist. There were but three possible ways in which one person could have acquired two or more entries under said statute, to wit: By purchasing two or more orders from the county court and making entries in pursuance of them; by succeeding in whole or in part to two or more entries, or two or more orders, as heir or devisee, and, if the succession related

to orders, making entries in pursuance of them; and, lastly, by purchasing, in whole or in part, two or more entries from the persons who made them, or two or more orders from the persons who purchased them from the county court, and making entries in pursuance of them. In the letter of the statute, an indication may be found of an intent on the part of the Legislature that neither orders nor entries should be assignable, and that, therefore, one person should not have authority to acquire two or more entries in the last way suggested. As, for instance, it was expressly provided by subdivision 9 of said section that a plat and certificate of survey should be assignable, and that upon the assignment a patent should issue to the assignee. This provision may be regarded as containing an implicit negative that neither an order nor an entry should be assignable, upon the ground that, if the Legislature had intended that either should be, it would have so provided, the same as in case of a survey; and the effect of the omission so to provide may be claimed to be strengthened by the consideration that, though the vacant land laws of Kentucky have always contained an express provision in regard to the assignment of vacant land claims, such provision had not always been limited to the survey.

The act of 1815 (Acts 1814–15, p. 402, c. 249, § 12), the first act authorizing the acquisition of such lands generally, and modeled after the Virginia land laws, contained, the same as did those laws, an express provision to the effect that warrants and plats and certificates of survey should be transferable by assignment. This act was succeeded by the act of 1835 (Acts 1834–35, p. 359, c. 875), which in turn was succeeded by the act in question. This act of 1835 was the first act to vest title to such lands in the various counties of the state, and authorize the county courts thereof to dispose of same for county purposes. It did away with warrants, and contained no provision for entries. The only stage in advance of the survey, which it prescribed as a part of the process of acquiring title to such lands, was an order of the county court directing the surveyor to survey the quantity of land sold, and return a plat and certificate thereof to the court, to be recorded and a copy deposited with the register as his authority for issuing the patent. It was provided therein that the surveys thereby provided should be assignable. In thus limiting the provision in relation to the assignment of a vacant land claim to the survey, as the act of 1835 and the statute in question did, some ground for inferring a change of intent as to the particular stage of its growth at which a vacant land claim should be assignable may be found.

It may be claimed, however, that the decision of the Kentucky Court of Appeals in the case of Hart v. Benton, 3 Bibb, 420, that a settlement under the Virginia land laws was assignable, though those laws, as did the act of 1815, omitted to provide expressly that any entry or a certificate to an actual settler, answering to a warrant, should be assignable. But it so held, because warrant entries, certificates to such settlers, and settlement entries, though not within the letter of the statute, were within its spirit. The indication of this as to warrant entries is referred to by Judge Logan, who delivered the opinion of the court, in these words:

"Upon the reason and policy of the law there can be but little doubt. The object of the Legislature was obviously to authorize the transfer of claims to

lands; and when, in advancement of this policy, it provided that warrants or certificates of survey might be assigned, it seemed necessarily to involve the right to transfer the claim at any intermediate stage. For the transfer of the right in a warrant, whether before or after the entry, in virtue of it would transfer to the assignee similar power over it; for, if the warrant were located, he might withdraw and re-enter the same, so that the same effect would be produced."

The indication of it as to certificates of actual settlers and settlement entries made by them is referred to by Judge Logan in these words:

"The law, literally taken, does not embrace settlement rights until after they had been surveyed; for warrants were not required in the case of settlement entries. The certificate of the court of commissioners operated, however, as the warrant upon which the claim should be entered; and yet it cannot be presumed that the Legislature intended to authorize the transfer of treasury claims merely, while settlements, to which a preference was given, should be held not transferable previous to surveying."

In the statute in question, however, there is an entire absence of any such indication that it was within the spirit of that statute that vacant land claims should be assignable at an earlier stage than that expressly provided, to wit, the survey.

Another indication to the same effect may be found in the provision of subdivision 1 of the section that the entry may be made by the party obtaining the order from the county court. This may be considered as excluding the idea that an entry can be made by any one else, as, for instance, by an assignee of the order, on the principle of statutory interpretation that, when a statute provides how or by whom a thing may be done, it excludes the idea that it may be done in any other way or by any other person—a principle oftenest applied to statutes creating a liability and providing a remedy for its enforcement. Pollard v. Bailey, 20 Wall. 520, 22 L. Ed. 376. If it does exclude the idea that an entry may be made by the assignee of an order, then orders were not assignable, and, if orders were not, it is not likely that entries were.

Then, as to whether there is anything in the letter of the statute indicating an intent that one person could not purchase two or more orders from the county court, and make entries in pursuance of them, and, therefore, that he should not have authority to acquire two or more entries in this way, two matters may be referred to. It may be urged that the mere fact that the statute limits an order and entry to 200 acres is, in and of itself, an indication of such intent. For why, it may be said, limit an order and entry to that quantity, if it was permissible for one person to acquire any number of acres by purchasing from the county court as many orders, and making entries in pursuance of them, as would cover the number of acres he desired to acquire? And it must be conceded that there is some force in this position, unless it can be shown that the object intended to be accomplished by the restriction would be effectuated, notwithstanding one person was permitted to acquire two or more entries in this way. Again, it may be urged that the fact, if it be a fact, that one person could not acquire two or more entries by purchase of them, or of orders from others, is an indication of intent that he should not acquire them by making them in pursuance of orders purchased from the

county court. This, of course, would depend upon the question whether any good reason could be shown why the Legislature would forbid such acquisition in one way, and yet permit it in another. If none could be shown, then there would be room to contend that the intention was that they could not be acquired in any way.

But it is unnecessary to determine the exact effect of these two considerations upon the question whether it was the intent of the Legislature that one person should not have authority to acquire two or more entries in this way. For the Court of Appeals of Kentucky, in the case of Register v. Reid, 9 Bush, 103, has decided that the statute did authorize one person to acquire two or more entries in this way. The grounds upon which it was so held were that the object intended to be accomplished by the restriction would be effectuated without limiting one person to obtaining one order from the county court, and making an entry in pursuance thereof; and the land department of the state had so construed the statute from its enactment until that controversy arose, over 20 years thereafter. The decision, it is true, was by a divided court, and Judge Burnam, in the recent cases of American Ass'n v. Innis, 60 S. W. 388, and Uhl v. Reynolds, 64 S. W. 498, seems to indicate some doubt as to whether it was correctly decided. In the former case he said:

"However much we might be inclined to dissent from the views expressed in that opinion as an original proposition, it must be regarded as settled law, as vast pecuniary transactions have been made on the faith of it, and any departure therefrom would involve in ruin many innocent purchasers of vacant land taken up exactly as it was in that case and this one."

In the latter one he said:

"While this opinion has been more or less criticised by the profession, it has been uniformly followed by this court in numerous subsequent decisions, and vast property rights have been acquired on the faith of it, and any departure therefrom at this late day would involve in ruin many innocent purchasers of vacant land taken up as it was in this case."

But whilst this is so, and though we think Judge Burnam is mistaken in saying that it has been followed by said court in numerous subsequent decisions—that in the case of American Association v. Innis being the only one which we have been able to find—yet that case has never been reversed, and has been followed by said case. We must accept it, therefore, as setting forth the settled conviction of the Court of Appeals as to the true construction of the statute in this particular, and are bound by it.

Then, as to the other possible way in which one person could acquire, in whole or in part, two or more orders or entries—to wit, by succession—we have this to say: There is nothing in the statute indicating the intent of the Legislature on this subject one way or the other, except in so far as what has already been referred to may be thought to have a bearing thereon. But as orders and entries were valid vacant land claims, and therefore property rights, it may be too much to say that one could not have succeeded to them by inheritance or devise. It is possible, even, that the mere fact that they were property rights should have a controlling influence on their

assignability, notwithstanding the considerations already adduced as having a leaning against it. And this fact, in connection with the express provision that surveys were assignable, showing that, at least at that stage of the growth of vacant land claims, one person could acquire any number of them, and the further possible fact that it did not contravene the object intended to be accomplished by the restriction to 200 acres, may be sufficient to justify a holding that one person under the statute was impliedly authorized to acquire and hold two or more entries in either of the ways suggested—so that it was possible for one person to acquire two or more vacant land claims of not exceeding 200 acres at any stage of their growth in intensity.

But it does not follow from this that the statute impliedly authorized one person, who had acquired two or more entries in either of the three ways suggested, to unite them in one survey. Three reasons occur to us for holding that it did not so authorize them to be so united. One is the express requirement, in subdivision 2 of the section, that the entries should be surveyed by the surveyor "in the succession in which the same are made." Applying the principle heretofore referred to, that when a statute provides how a thing shall be done, it excludes the idea that it can be done in any other way, this requirement excludes the idea that entries can be surveyed in any other way than in the succession in which the same are made, as, for instance, together. It cannot be claimed that the requirement that entries shall be surveyed in succession applies only to entries held by different persons; for the requirement is general, and applies, therefore, to all entries, whether held by different persons or by one person. Another reason is the fact that the survey, as well as the entry, is prescribed to be made under the authority of the order. The terms of the order made by the county court, according to the provisions of the statute, should contain an authority to the person obtaining it both to enter and survey the quantity of land it called for. It would seem, therefore, that the survey could not exceed the authority under which it was made. If a survey contained 400 acres, there could be no authority for such a survey in any order obtainable; for each order was limited to 200 acres, and an authority to survey two separate tracts of 200 acres each was not an authority to survey one tract of 400 acres. As, then, the entry was limited by the order, so was the survey. The final reason is that interpreting the statute to impliedly authorize two or more different entries held by one person to be united in one survey frustrates, if it does not actually defeat, the only possible objects that can be assigned for the Legislature's limiting an order and entry to not exceeding 200 acres. That the object intended to be accomplished by a statutory provision is one of the strongest, if not a controlling, consideration in interpreting its true meaning, is everywhere recognized. The law to this effect is thus stated in Federal Statutes Annotated, vol. 1, p. xxvii:

"In the construction of a statute, that exposition ought to be adopted which carries into effect the true intent and object of the legislature in its enactment. 'Courts should ever lean to that interpretation of a statute which would further the object of the legislation, in preference to a construction based on purely artificial rules.' An interpretation which defeats any of the manifest purposes of the statute cannot be accepted."

We can conceive of but four possible objects that the Legislature could have had in view, and intended to accomplish, in restricting an order or entry to 200 acres. One is that it was in order to have enough vacant land to go around amongst those desiring it, and presupposes that applicants were numerous and vacant land not overabundant. If such was its object, then it could not have been the intent of the Legislature that one person could obtain two or more orders and make two or more entries, and it would not have contravened the object of the statute to hold it authorized the assignment of an order or entry, and the union of two or more entries in one survey. For that object would be accomplished by the single requirement that one person could obtain but one order and entry, including not more than 200 acres. It was to accomplish this object that the rules adopted by the California miners, enforced by the local courts, enacted into statute, and forming the model after which the Federal statutes in relation to the acquisition of title to mining lands were framed, limited a miner to a single location of a limited extent; the location answering to an entry under the statute in question. That being the sole object of the restriction of a location by these rules and subsequent statutes, a location was held to be assignable, and any number of them could be included in one survey and patent. Mr. Justice Field, in Smelting Co. v. Kemp, 104 U. S. 636, 26 L. Ed. 875, thus alludes to this feature of those miners' rules, and the effect of it, in view of its object:

"Soon after the discovery of gold in California, as is well known, there was an immense immigration of gold seekers into that territory. They spread over the mineral regions and probed the earth in all directions in pursuit of the precious metals. Wherever they went they framed rules prescribing the conditions upon which mining ground might be taken up; in other words, mining claims be located, and their continued possession secured. Those rules were so framed as to give all immigrants absolute equality of right and privilege. The extent of ground which each might locate—that is, appropriate to himself—was limited, so that all might, in the homely and expressive language of the day, have an equal chance in the struggle for the wealth there buried in the earth. But a few months' experience in the precarious and toilsome pursuit drove great numbers of the miners to seek other means of livelihood and fortune, and they therefore disposed of their claims. They never doubted that their rights could be transferred, so that the purchaser would hold the claims by an equally good title. Their transferable character was always recognized by the local courts, and the title of the grantee enforced. Many individuals thus became the possessors of claims covering ground taken up by different locations, and the amount which each person, or an association of persons, might acquire and hold, was only limited by his or their means of purchase."

But it has never been claimed by any one, and there seems to be no room for holding, that such was the object the Legislature had in view, and intended to accomplish, by the express restriction upon an order and entry contained in the statute in question.

Another conceivable object is that it was for the purpose of inviting and encouraging the actual settlement and occupancy of vacant lands, by limiting the quantity to no more than would be reasonably necessary for the use of one actual occupant; in other words, to increase the population of the state. If such were the sole object of the restriction, it would be subserved by construing the statute not to au-

thorize one person to acquire more than one order and entry, and would not be seriously, if at all, affected by holding that entries were assignable and could be united in one survey under the statute. This was the object which was pressed upon the Court of Appeals of Kentucky in the case of Register v. Reid, and which it was claimed would be frustrated, if not defeated, by a construction of the statute which would allow one person to obtain more than one order and entry. But the Court of Appeals in that case denied that such was the object of the restriction, and it does not seem to us that there is any good reason for holding that it was.

If, then, the Legislature must have had some object in view in restricting an order and entry to 200 acres, and there are but four conceivable objects which it could have had in view, and neither of the two already referred to could have been had in view, it follows that the true object of said restriction must have been one or both of the other two.

One of these is that it was for the purpose of increasing the revenue of the state. The act of 1835, as has been heretofore stated, vested the title of the vacant lands of the state in the various counties thereof, and authorized the county court to sell and dispose of them for county purposes. No restriction whatever was placed therein upon the quantity of land which might be sold to any one person, and it expressly provided that the "register should issue the patent without fee." The Revised Statutes allowed the county courts still to sell the lands and get the proceeds of sale; but they made the restriction in question, and by section 14, art. 2, chapter 83, thereof, fixed the cost of a patent at $3.25, which went into the state treasury.

The remaining possible object is that it was for the purpose of preventing, as far as possible, the conflict and confusion of boundaries and claims which might arise from including in grants of large quantities of land smaller entries and surveys, for which patents may have already issued, or, in other words, the overlapping of patents. This was held to be the true object of the restriction by the Court of Appeals of Kentucky in the case of Register v. Reid. It is entirely reasonable to conclude that the Legislature had in view both these objects in making said restriction. They presuppose that the objection of the Legislature was not only to a vacant land claim starting with a greater extent than 200 acres, but to its increasing in extent at any stage of its growth, and both would, therefore, be frustrated, if not defeated, by a holding that the statute authorized two or more entries to be united in one survey. Take, for instance, the patent involved herein. As shown by counsel for defendants, if 202 separate patents, of 200 acres each, had been issued for the 40,400 acres included in that patent, the revenue to the state would have been $656.50 instead of $3.25. Then as to the other object. It is readily seen that if, instead of running a single boundary of 78,262 acres, which, in the patent, consisted of the lines of Clay, Perry, and Letcher counties, and the ridge of Pine Mountain, the unpatented portion thereof, containing 40,400 acres, had been divided into surveys of 200 acres each, how much less chance would there have been of the patent including the

grant or claim of others, and of a confusion and conflict of boundaries between them.

These two possible objects of the statute would not be contravened or affected in the slightest particular by a holding that one person could acquire two or more entries by obtaining orders from the county court, and making entries in pursuance of them, or by a holding that orders and entries were assignable. They would only be affected by a holding that two or more entries could be united in one survey. These three several considerations constrain us to hold that the statute did not impliedly authorize two or more entries held by one person to be united in one survey.

How, then, as to the union of two or more surveys in one patent? Of course, if the statute impliedly authorized this, it could only be done by keeping the several surveys separate and distinct in the patent. By no possible process could the several surveys be converted by a union in the patent into one. If, then, the patent shows but a single survey, there has not been a conversion of several surveys into one, but a union of two or more entries in one survey. In this case, therefore, as the patent shows but a single survey, it shows a union of two or more entries in one survey, and not a union of two or more surveys in the one patent. We are, therefore, not concerned in this case with the question whether the statute authorized the union of two or more surveys in one patent. None of the considerations which have led us to the conclusion that the statute did not authorize the union of two or more entries in one survey can be adduced in favor of the position that it did not authorize the union of two or more surveys in one patent, save the last, and it only in so far as the object in relation to state revenue is concerned. That object would be affected by such a holding.

We have thus undertaken to interpret the statute in the particulars concerned in the light of its phraseology and purpose. That the interpretation we have arrived at in the matter of the union of two or more entries in one survey is correct finds support in an additional consideration, to wit: That such was the interpretation of the statute by the Legislature, as evidenced by two subsequent acts, one of which in effect was, and the other of which expressly purported to be, an amendment thereof. The one was passed March 9, 1872 (1 Acts 1871-72, p. 562, c. 487), and "validated, legalized and confirmed" all surveys for a greater number of acres than 200 to one person then on file, or which might be filed within 60 days thereafter, in the register's office, for any land located, entered, and surveyed in the counties of Lawrence, Martin, Floyd, Pike, Perry, Clay, Letcher, Bell, and Johnson. The other was passed March 27, 1872 (1 Acts 1871-72, p. 74, c. 827), and authorized the register of the land office to issue patents to persons who had surveyed, or might thereafter survey, vacant and unappropriated lands in the counties of Greenup, Lawrence, Pike, Floyd, Laurel, Letcher, and Clay, for any number of acres so surveyed and appropriated. Neither of these acts embraced the county of Harlan, but they are evidence of legislative opinion that the law as it stood when said amendments were passed, which was the statute in question, did not permit a survey for a larger quantity of land than 200 acres;

that is, a single entry. Possibly the effect of this consideration is somewhat weakened by the preamble to the first of said two acts, which recites as the occasion of its passage the fact that:

"Various persons in this commonwealth have bought county court land warrants for a greater number of acres than 200 to one person, and caused same to be located and surveyed in the counties of Lawrence, Floyd, Pike, Perry, Letcher, Clay, Martin, Bell, and Johnson; and * * * doubts have arisen as to the validity of such surveys, and the register of the land office has refused to issue patents thereon."

In so far as this preamble evinces that the object of the act was not to change the law, but simply to remove doubts as to the validity of such surveys, it may be said to weaken this consideration in its bearing on the true interpretation of the statute in the particular in question. The other act contains no such preamble, and is a straight-out amendment to the statute permitting that to be done, which, according to defendants' contention, was already permitted to be done by the statute. Our conclusion, therefore, is that there can be no doubt but that, under the statute in question, two or more entries could not be united in one survey, and that in this way a person could not obtain a patent for more than 200 acres. The statute clearly required that each entry should be surveyed separately, and we do not see how it is possible for anybody to reach a different conclusion. Not a single consideration occurs to us that can induce any one to do so.

Having thus considered the question on the merits, what is the state of the authorities bearing upon it? And, before we come to take up the Kentucky authorities relating thereto, we desire to direct attention to two decisions of the Supreme Court of the United States, which have been cited as being antagonistic to the conclusion we have reached. They are contained in the cases of Polk's Lessee v. Wendal et al., 9 Cranch, 87, 3 L. Ed. 665, and Smelting Co. v. Kemp, 104 U. S. 636, 26 L. Ed. 875. Neither of these cases involved the statute in question. The former involved a North Carolina statute, and the latter a statute of the United States in relation to mining lands. The claim is, however, that those statutes are sufficiently similar to the Kentucky statute, in the particular involved herein, to make the reasoning of the court therein applicable hereto. But an inspection of those cases will clearly show that the statutes therein involved are in no way similar to the Kentucky statute in the particular involved herein. In other words, each of the statutes involved in those two cases expressly authorized, the former two or more entries, and the latter two or more locations, which answered to entries when held by one person, to be united in one survey and patent. A decision, therefore, that what was expressly authorized by statute could be done, is certainly not applicable to a case where the statute does not expressly authorize such union, but there is some question and doubt as to whether one person could acquire two or more entries, and where further right to make such union is negatived by the requirement of the statute that the entries shall be surveyed in succession, by the provision that the survey is done under authority of the order, which is limited to 200 acres, and by the fact that the sole object, or objects, which the Legislature could have had in view in making the

restriction, would be frustrated, if not entirely defeated, by allowing two or more entries to be so united. That in each case there was such express authority will now be shown.

In the earlier case of Polk's Lessee v. Wendal, the statute involved was the act of April, 1784. That act contained a provision expressly allowing two or more persons to unite their separate entries in one survey. Mr. Chief Justice Marshall said:

"It is therefore contended that the court cannot extend the provision to the case of distinct entries belonging to the same person. For this distinction it is impossible to conceive a reason. No motive can be imagined for allowing two or more persons to unite their entries in one survey, which does not apply with at least as much force for allowing a single person to unite his entries adjoining each other in one survey. It appears to the court that the case comes completely within the spirit, and is not opposed by the letter, of the law."

In that case reference was made to the earlier act of April, 1783, by way of inducement, as leading up to a consideration of the later act, which was the only one really involved therein. That act contained no provision authorizing the union of entries held by one or different persons in one survey. Concerning that act Mr. Chief Justice Marshall said:

"This act limits the amount for which an entry might be made. But the same person is not, in this act, forbidden to make different entries; and entries were transferable. No prohibition appears in the act which should prevent the assignee of several entries, or the person who has made several entries, from uniting them in one survey and patent. The court does not perceive, in reason or in the directions of the law respecting surveys, anything which should restrain a surveyor from including several entries in the same survey. The form of surveys, which is prescribed by law, if that rule should be considered as applicable to surveys made on several entries united, may be observed, and in this case is observed, notwithstanding the union of several entries."

This may be thought to be coming quite close to the case in hand. But in several particulars it has no application to it. In the first place, under that statute entries were transferable by express provision, so that there was no question but that thereunder one person could acquire two or more entries, capable of being united in one survey by purchase, which fact, in absence of any express provision against it, had some bearing on the question as to whether one person could not make two or more entries. Under the statute in question, it is, to say the least, apart from the decision of Register v. Reid and American Ass'n v. Innis, very doubtful whether or not one person could in any way acquire two or more entries capable of being so united; and the considerations heretofore referred to lean to the position that he could not acquire them by purchase, however it might be otherwise—a position that is not affected by the decision in Register v. Reid.

Then, again, Mr. Chief Justice Marshall, in the extract quoted, says that:

"The court does not perceive, in reason or in the directions of the law respecting surveys, anything which should restrain a surveyor from including several entries in the same survey."

For a surveyor, under the statute in question, to include two or more entries in one survey, would be to contravene the only possible

object which the Legislature could have had in view in restricting orders and entries to 200 acres, to violate the express direction of the statute that he shall survey the entries in succession, and to exceed the authority under which he is acting, to wit, the order of the county court.

But, in addition to all this, though Mr. Chief Justice Marshall thus interpreted the act of 1783, he waived his interpretation thereof in deference to that of the Legislature, as manifested by the later act of 1784. He said:

"As all laws on the same subject are to be taken together, it is argued that this act (meaning the act of April, 1784) shows the sense of the Legislature respecting the mode of surveying entries, and must be taken into view in expounding the various statutes upon that subject. It evinces unequivocally the legislative opinion that, as the law stood previous to its passage, a joint survey of two entries belonging to the same person, or to different persons, could not be made. The right to join different entries in the same survey, then, must depend on this act."

We have somewhat the same conditions of things here. In so far as the acts of March 9, 1872, and March 27, 1872, validating and authorizing surveys containing more than 200 acres in certain named counties, evince an opinion on the part of the Legislature that, as the law then stood, surveys could not be made for a greater quantity, the position of Mr. Chief Justice Marshall is directly in point.

Then, as to the case of Smelting Co. v. Kemp: That case involved the acts of Congress in relation to the acquisition of title to placer mining lands held by the United States by persons desiring to acquire title thereto, the first of which acts was passed in 1870 (16 Stat. 217, c. 235). Under these acts one person could make but one location, and that for not exceeding 160 acres. This provision was carried into the statute from the rules of the California miners, and the object of it was to insure that there would be enough land to go around amongst those seeking it. Likewise, coming from the same source, those acts recognized, if they did not expressly provide, that locations were assignable, so that one person could acquire two or more locations by purchase, though he could not acquire them by making them. This provision did not contravene the object intended to be subserved by the requirement, that one person could make but one location of a limited extent, but, on the contrary, was of advantage to those miners who were unfortunate or became discouraged. The question involved in that case was whether two or more locations held by one person, acquired by him in whole or in part by purchase, could be united in one survey. It was held that they could be, and the ground upon which it was held that this could be done was that the statute provided that the survey and patent should be made for a placer mining claim. Whatever then constituted a placer mining claim was expressly authorized to be included in one survey and patent, and it was held that a placer mining claim might be limited to a single location, but might also include any number of adjoining locations. In other words, it was held that two or more adjoining locations owned by the same person, acquired in whole or in part by purchase, constituted but a single placer mining claim, and, as the statute expressly provided that a survey and patent should be made for a placer mining claim, it ex-

pressly provided that two or more locations owned by one person so acquired, might be included in one survey and patent, the same as if the statute had so provided in so many words. Mr. Justice Field said:

"The difficulty with the court below, as seen in its charge, evidently arose from confounding 'location' and 'mining claim,' as though the two terms always represent the same thing, whereas they often mean very different things. A mining claim is a parcel of land containing precious metal in its soil or rock. A location is the act of appropriating such parcel, according to certain established rules. It usually consists in placing on the ground, in a conspicuous position, a notice setting forth the name of the locator, the fact that it is thus taken or located, with the requisite description of the extent and boundaries of the parcel, according to the local custom, or, since the statute of 1872, according to the provisions of that act. Rev. St. § 2324 [U. S. Comp. St. 1901, p. 1427]. The location, which is the act of taking the parcel of mineral land, in time became among the miners synonymous with the mining claim originally appropriated. So, now, if the miner has only the ground covered by one location, 'his mining claim' and 'location' are identical, and the two designations may be indiscriminately used to denote the same thing. But if by purchase he acquires the adjoining location of his neighbor—that is, the ground which his neighbor has taken up—and adds it to his own, then his mining claim covers the ground embraced by both locations, and henceforth he will speak of it as his claim. Indeed, his claim may include·as many adjoining locations as he can purchase, and the ground covered by all will constitute what he claims for mining purposes, or, in other words, will constitute his mining claim, and be so designated. Such is the general understanding of miners and the meaning they attach to the term."

Besides, the act of Congress of 1870 contained a provision (Act July 9, 1870, 16 Stat. 217, c. 235, § 12) permitting two or more persons, or association of persons, having contiguous claims "of any size," to make joint entry thereof. This expressly recognized that one person, or association of persons, might have claims "of any size," and brought the case within that of Polk's Lessee v. Wendal. As to this provision, Mr. Justice Field said:

"If one individual should acquire all such contiguous claims by purchase, no sound reason can be suggested why he should not be equally entitled to enter them all by one entry, as when they were held by the original parties. To quote the language of the case cited [Polk's Lessee v. Wendal], 'No motive can be imagined for allowing two or more persons to unite their entries in one survey which does not apply with at least as much force for allowing a single person to unite his entries, adjoining each other, in one survey.'"

In addition there were two other considerations which led in the same direction. One of them is thus referred to by Judge Field in these words:

"It is difficult to perceive what object would be gained, what policy subserved, by a prohibition to embrace in one patent contiguous mining ground, taken up by different locations, and subsequently purchased and held by one individual."

The other is referred to by him in these words:

"The practice has been common for miners to consolidate, by conveyance to a single person or an association or company, many contiguous claims into one, for which only one application is made, and of which only one survey is had. Long before patents were allowed—indeed, from the earliest period in which mining for gold and silver was pursued as a business—miners were in the habit of consolidating adjoining claims, whether they consisted of one or more original locations, into one, for convenience and economy of working them. It was therefore very natural, when patents were allowed, that the practice of presenting a single application, with one survey of the whole tract,

should prevail. It was at the outset, and has ever since, been approved by the department, and its propriety has never before been questioned. Patents, we are informed, for mining ground, of the value of many millions of dollars, have been issued upon consolidated claims, nearly all of which would be invalidated if the position assumed by the defendants could be sustained."

This is sufficient to show how far away from the case in hand this case is. In none of its features is it at all like that case. The only thing in it that has any bearing whatever upon the case in hand is a reference to the fact that the revenue which the United States received from the issuance of patents for mining lands would not be affected by the number of acres that might be included in a patent. Judge Field said:

"If he wishes, however, to obtain a patent, he must, in addition to other things, pay the government a fee of $5 an acre, a sum that would not be increased if a separate patent were issued for each location."

This implies that the question as to whether the revenue of the government will be affected by the number of acres included in a patent under a statute like the one involved herein is of significance in the interpretation of the statute involved herein as to how many acres it was intended should be included in a patent issued thereunder. We are at a loss, therefore, to understand how it is possible for any one to think that either of these two cases, to any extent, militates against the view we have taken of the Kentucky statutes in the particular involved herein.

It remains to consider any decisions of the Court of Appeals of Kentucky bearing upon the true interpretation of the statute in the particular involved herein. The only ones to which our attention has been directed, are the following, to wit: Register v. Reid, supra; Breathitt C., I. & L. Co. v. Strong, 51 S. W. 189; West v. Chamberlain, 58 S. W. 584; American Ass'n, Limited, v. Innis, 60 S. W. 388; Uhl v. Reynolds, 64 S. W. 498; Nichels v. Com., 64 S. W. 448.

We have already made some references to the case of Register v. Reid. That case is not adverse to the position which we have taken. The sole question involved therein was whether one person could obtain from the county court two or more orders, and make entries in pursuance of them. The question as to whether or not he could have two or more entries thus made by him united in one survey and patent was not involved therein, and could not possibly have been involved therein; for each entry had been surveyed separately, and a patent was asked for each survey separately. On the contrary, every implication to be drawn from this case is in favor of the construction we have placed upon the statute in the particular involved herein. The fact that the entries had been studiously kept separate, and separate patents were asked for each survey, and there was no intimation in the opinion, from beginning to end, that the entries could have been united in one survey and patent, in connection with the fact that the court differed as to whether one person could obtain two or more entries at all, evinces that everybody connected with the case thought that such person's ability to obtain them in the way he had was the very verge of what he was able to do under the statute. But beyond this is the importance which the court attaches to the object had in view by a

statute in determining its true construction, and the further fact that it holds that the true object of the restriction in the statute in question was to prevent the overlapping of patents, and the confusion of boundaries arising therefrom. One can hardly refrain from expressing the conviction that, if it had been involved in the case and been claimed that the statute impliedly authorized the union of two or more entries in one survey and patent, the court would have scouted at the very idea. All of the other cases are of recent origin. The earliest of them, that of Breathitt Coal, Iron & Lumber Co. v. Strong, 51 S. W. 189, was decided May 26, 1899, not quite four years ago, and a little over a year before the institution of this suit. The rest of them were decided after the institution of this suit and during the pendency thereof.

In the case of Breathitt Coal, Iron & Lumber Co. v. Strong, the patent involved was for land in Breathitt county, which was not one of the counties included in said acts of March 9, 1872, and March 27, 1872, and was for 154,800 acres, excluding 25,800 acres of patented and otherwise appropriated land. The patent had been issued June 15, 1872, whilst the Revised Statutes were still in force, and its validity was dependent upon the statute involved herein. It was held valid. The only question discussed in the opinion, delivered by Judge Paynter, was whether the patent was void for uncertainty, in that it did not identify or describe the prior grants excluded from the patent. It was held that it was not void on that ground. The question was in the case, however, whether the patent was void on the same ground urged herein, to wit, that it was upon a survey largely in excess of 200 acres; and, so far as that particular patent is concerned, that decision is res adjudicata upon that question. It is not entirely certain that Judge Paynter made any reference to this question in the opinion. If he did so at all, it was in saying that:

"The only question which merits consideration is whether the patent is void by reason of its failure to describe the excluded boundaries."

What makes one doubt whether, in making this remark, reference was had to this question, is that it must be held that that question certainly merited consideration, and it is hard to conceive on what ground it was thought that it did not. It had never been considered, much less determined, by the Court of Appeals in any preceding case, so far as its published opinions show; and its importance, and the arguments in favor of the patent being void on this ground, were at least sufficiently strong not only to make it merit, but to demand, consideration. Yet there is reason for believing that this question was had in view when this remark was made. That reason is that it had been presented to the court by counsel for party attacking the patent, as their brief in the record shows. Is there any way, then, for accounting for the court's having this question in view, and yet treating it so lightly? If there is, that way should be accepted.

We think that there is such a way. Counsel supporting the patent took the position that the patent therein involved was the same patent which the register had been directed to issue in the case of Register v. Reid—the "very selfsame patent"—and in obedience to the mandate

therein, said patent was issued, and that, therefore, the question as to the invalidity of the patent, on the ground that it covered more than 200 acres, was res judicata. This position the Court of Appeals must have taken to be correct, and, because of it, it must have felt that it was barred from a consideration of that question. The position, however, was certainly not well taken. The Court of Appeals, in the case of Register v. Reid, did not direct any such patent to issue. The only patent which it in that case directed to issue was a patent for the 200-acre survey of the entry of the second order, obtained by the appellee, Reid, from the county court of Breathitt county. It is possible, if not probable, that before or after that decision was rendered Reid procured from said court 645 orders in all—a number of which, in addition to the two referred to in that case, were likewise entered and surveyed separately—and after the case was decided, upon the idea that the decision justified it, all the entries made in pursuance to said orders were united in one survey and said patent issued therefor. It is significant of this that the land sued for in the case under consideration was only 1,200 acres of the large boundary of 129,000 acres net, and that these 1,200 acres are described in the petition in six different boundaries, each containing 200 acres. After the decision was rendered in that case, a petition for rehearing was filed by the defeated party, and in his petition the question as to the invalidity of the patent on account of its great acreage was brought to the front. This petition was never acted upon by the Court of Appeals, as it was withdrawn by the party filing it before it had done so.

The next case was that of West v. Chamberlain. In that case the patent involved was for land in Whitley county, which also was not one of the counties included in the two acts of March, 1872. The patent covered a large acreage, from which certain exclusions were made. It was issued the 18th day of October, 1855, whilst the Revised Statutes were still in force, and its validity also depended upon the statute involved herein. It was held valid. But in that case the question whether the patent was void on the ground claimed herein was not considered or determined. There is no reference whatever to the question in the opinion. The sole question considered and determined was as to whether the patent was void for uncertainty on the same ground as in the Breathitt County Case. Of course, however, the decision therein was res judicata as to that question between the parties thereto and their privies.

This case was followed by that of American Ass'n v. Innis. In that case the validity of 61 patents, for 200 acres each, located in Bell county, and issued before said acts of March, 1872, was involved. The same question was raised therein as to the validity of said patents, as in the case of Register v. Reid, and that question was disposed of on the authority of said case, though with an intimation of a doubt as to the correctness of the decision contained in the quotation from the opinion therein heretofore made.

Then comes the case of Uhl v. Reynolds. The patent involved therein was issued June 14, 1872. It was for land in Clay county. Just how much is not stated, but it was for a much larger quantity

than 200 acres. It was issued after the passage of the acts of March 9 and March 27, 1872, and whilst they were still in force, and, as Clay county was embraced by both acts, the validity of said patent depended entirely on those acts. The provisions of the Revised Statutes in regard to the acquisition of title to vacant lands had nothing whatever to do with their validity, for at the time it was issued the statutes were not in force in either one of said counties. The Court of Appeals held that it was valid under said special acts; Judge O'Rear dissenting upon the ground that said acts were intended to accomplish no more than it was subsequently decided in the case of Register v. Reid could be accomplished under the Revised Statutes, to wit, the issuance to one person of two or more patents for 200 acres each. The Court of Appeals, however, in a dictum, held that said patent would have been valid under the Revised Statutes. Judge Burnam said:

"In the brief filed by the very able counsel for the appellees, it is first contended that, under the statute as it existed at the time this survey was made, not more than 200 acres of land could be appropriated by a single individual, referring to section 3 of chapter 102 of the Revised Statutes, which was in force at the time this survey was made, and that for this reason the patent was against the public policy of the state, and consequently void. In response to this contention, it may be said that it was held in the case of Register v. Reid, 9 Bush, 103, by this court, in construing this identical statute, that the same person could purchase and patent several orders of the county court, each for 200 acres, or any less number; and, while this opinion has been more or less criticised by the profession, it has been uniformly followed by this court in numerous subsequent decisions, and vast property rights have been acquired on the faith of it, and any departure therefrom at this late day would involve in ruin many innocent purchasers of vacant land taken up as it was in this case."

As heretofore stated, the only case which we have been able to find, following the case of Register v. Reid, is that of American Ass'n v. Innis, and until we have our attention directed to others we must take it that the statement that it has been uniformly followed by said court in numerous subsequent decisions is a mistake. But the question involved in Register v. Reid, as heretofore more than once pointed out, was whether one person could obtain two or more patents for 200 acres each, and not whether he could obtain one patent for more than 200 acres. The two questions are entirely separate and distinct, and it does not follow, from the fact that he could do the one, that he could do the other. The doing of the one would not frustrate any of the objects of the statute in restricting an order to 200 acres, whereas the doing of the other would; and the doing of the one would not be contrary to the express requirement of the statute that entries should be surveyed in succession, whereas the doing of the other would, if the patent embraced a survey for more than 200 acres. The court, in the case under consideration, seems to be under the opinion that the question involved and decided in the case of Register v. Reid was whether one person could acquire title to more than 200 acres of vacant land, when the question was not so broad as that. It was simply whether he could acquire title to more vacant land than that in separate patents for 200 acres each.

The decision that he could was not a decision that he could acquire title to more than that by one patent.

And, lastly, we have the case of Nichels v. Commonwealth. The patent therein involved was issued February 28, 1874, on a survey made May 16, 1873. It was for land in Letcher county, and as that county was embraced in both of said acts of March 9 and March 27, 1872, and the initial stages of acquiring title to the land covered by the patent were taken whilst those acts were in force, the validity of said patent depended entirely upon said acts, and the Revised Statutes had nothing whatever to do therewith. The patent covered 34,-800 acres of land, but it would seem from the opinion of the court that they were not contained in one survey, but in 174 distinct surveys of 200 acres each. The attack upon the patent was a direct one by the commonwealth, and in this particular the case differs from the other cases heretofore considered, for in all of them the validity of the patent was raised collaterally. The main ground of attack upon the patent was that the survey purported to have been made in blocks of 200 acres each, when in fact only the entire boundary was surveyed, and the plat was made by running a base line and platting off the land in blocks of 200 acres. It was held that the patent was valid under said acts of March, 1872; but in a dictum it was also held that it would have been valid if it had been issued under the provisions of the Revised Statutes. Had it been so issued, it would have involved the question, not whether two or more entries could be united in one survey, but whether two or more surveys could be united in one patent, and the further question whether an actual survey of each 200 acres was necessary. We cannot help but question the holding that an actual survey was not necessary, in view of the terms of the statute in relation to the survey, and its object to prevent overlapping of patents. It had been so held in American Ass'n v. Innis. But in that case the question was raised collaterally, whilst in this case it is raised in a direct attack upon the patent. As to the other question, Judge Hobson said:

"In Association v. Innis, 60 S. W. 388, and in Uhl v. Reynolds (decided at this term) 64 S. W. 498, we fully considered most of these questions. In those cases the previous decisions of the court are collected, and, as we said then, however much we might be inclined, as an original proposition, to question the correctness of the rule heretofore established, we cannot depart from it after it has been acted on for so many years, and the titles to large bodies of land have been bought and sold upon the faith of those decisions. To do so would be to depart from the rule of stare decisis. The arguments that are so earnestly pressed upon us by appellee's distinguished counsel, and elaborated in the dissenting opinion of Judge O'Rear in the case of Uhl v. Reynolds, were forcibly stated by Judge Pryor in his dissenting opinion in Register v. Reid, 72 Ky. 103; and for us now to take this view, and hold a patent issuing for more than 200 acres to be void, would be for us now substantially to adopt the rule urged by Judge Pryor in that dissenting opinion, notwithstanding the fact that this court has sustained numbers of patents under this statute, similar to the one before us, on the authority of the majority opinion in that case. There is no provision of law inhibiting the inclusion of several surveys in one patent. It being settled that one person might at the same time make two surveys, each of 200 acres or more, at his election, the land office issued patents upon these surveys, including in one grant as many surveys as were desired, at the request of the patentee. When there was no statute forbidding this, and such patents have time and

again been recognized by this court, after large sums of money have been invested on the faith of this practice of the land office and these decisions of this court, it would be, in our judgment, a departure from well-settled legal principles for us not to declare such patents invalid."

We find here, again, a misapprehension as to the thing decided in the case of Register v. Reid. It is thought that it was decided therein that a patent could issue for more than 200 acres, when, as seen, it was simply decided that one person could obtain more than one patent for 200 acres, or, in other words, that one person could acquire title to more than 200 acres of vacant land, not, however, by one patent, but in separate patents, no one of which covered more than 200 acres. That is the rule, and none other, heretofore established and acted upon, and to depart from it would be a violation of the rule of stare decisis, though it had not theretofore been followed as often in subsequent decisions as seems to be thought; the only case in which it came up again, and was followed, being that of American Ass'n v. Innis. That being the rule so established, it is no departure therefrom to hold that one patent cannot issue for more than 200 acres, or for two or more surveys, each of which contains not more than 200 acres. The case of Register v. Reid, therefore, did not require a holding that one patent could be issued for two or more of such surveys, and the holding in that case that it could was the first time in which it had been so held by the Court of Appeals. No other case before this one involved that precise question; and, though the holding may be correct, it does not follow therefrom that one patent can be issued for one survey of more than 200 acres—the question involved in this case. Unless one gets it clearly in his head that the questions—whether one person could obtain two or more patents for 200 acres each; whether one person could obtain one patent for two or more surveys, each of which is for not more than 200 acres; and whether one person could obtain one patent for one survey of more than 200 acres—are three distinct questions, nothing but confusion will result. In terms they are separate, and a decision of them in the affirmative involves entirely different consequences. A decision that one person could obtain two or more patents for not more than 200 acres each involves a violation of no express requirement of the statute, and contravenes no object which the Legislature could have had in mind in imposing the 200-acre restriction. A decision that one person could obtain one patent for two or more surveys of not more than 200 acres, whilst it violates no express requirement of the statute, does affect the revenue coming to the state from the issuance of patents, the increase of which is one of the possible objects which the Legislature so had in view. A decision that one person could obtain one patent for one survey of more than 200 acres not only involves a violation of the express requirement that entries should be surveyed in succession, and an exceeding of the authority in pursuance of which the survey is made, as prescribed in the statute, but affects both the possible objects which the Legislature had in view in making the restriction, to wit, the increase of state revenue and the prevention of overlapping. And it seems to us that it is due to a failure to recognize the entire

distinction of these three several questions, and the different consequences which follow from an affirmative answer to them, that the Court of Appeals has been led to suppose that all three of them were disposed of by the case of Register v. Reid, and that neither one of them was any longer an open question in this state.

Counsel for plaintiffs quote the court as saying, in response to a petition for modifying the opinion therein, these words:

"There is no provision of law inhibiting the inclusion of several surveys in one patent, it being settled that one person might at the same time make two surveys, each of 200 acres or more at his election; and the land office issued patents upon these surveys, including in one grant as many surveys as were desired, at the request of the patentee. This practice followed the ruling of the United States Supreme Court by Chief Justice Marshall in Polk's Lessees v. Wendal, 9 Cranch, 87, 3 L. Ed. 665, which was approved in Smelting Co. v. Kemp, 104 U. S. 648, 26 L. Ed. 875. When there was no statute forbidding this, and such patents have time and again been recognized by this court, after large sums of money have been invested on the faith of this practice of the land office and these decisions of the court, it would be, in our judgment, a departure from well-settled legal principles for it now to declare such patents invalid."

This quotation emphasizes, what appeared from the opinion, that the question involved in that case was whether two or more surveys could be included in one patent, and not whether two or more entries could be included in one survey—the case we have here. As is apparent from what has already been said, there is less ground for holding that the one could not be done than that the other could not; the sole ground for the former being that a holding that it could be would decrease the revenue coming to the state from the issuance of patents. But the two Supreme Court cases referred to, and already considered by us, are not authorities in support of any such practice. The question involved in them was, not whether two or more surveys could be included in one patent, but whether two or more entries could be included in one survey; and it was held that they could be, because it was so expressly provided in the statutes involved therein. Nor had any such practice been recognized by the Court of Appeals prior to that case, because that is the first case which involved it. All prior cases involved either the question whether one person could obtain two or more patents for not more than 200 acres each, or one patent for a survey of more than 200 acres. This exhausts all the decisions of the Court of Appeals bearing upon the question involved herein. We have felt called upon to express ourselves frankly in regard to those cases and the position taken in them; but it has been done with the highest respect for that Court, and a lively consciousness of our own liability to err, and even to be wrong in the positions we have taken in regard to them.

But the serious question is whether this court is not bound to follow these decisions, in so far as they hold that a patent could lawfully issue, under said statute, for a survey in excess of 200 acres, and to waive its own convictions in regard to the matter. It is well settled that the federal court must follow the decisions of the highest state court construing a statute of the state or laying down a rule

of property. The law in this regard is thus stated by Mr. Chief Justice Marshall in the case of Polk's Lessee v. Wendal, supra:

"In cases depending on the statutes of a state, and more especially in those respecting titles to land, this court adopts the construction of the state, where that construction is settled and can be ascertained."

A good statement of the law is made by Judge Deady in the case of Lauriat v. Stratton (C. C.) 11 Fed. 113:

"It is the established law of the national courts that, in the application of a statute of the state or a rule of law relating to the title of real property, they will follow the settled construction of the statute or application of the rule made by the highest court of the state."

Can it be said that it is the settled construction of the statute in question herein, by the Court of Appeals, that under it a patent could issue for one survey in excess of 200 acres? I think not, within the meaning of what is referred to by the words "settled construction," as used in this connection. What is said in the cases of Uhl v. Reynolds, and Nichels v. Commonwealth does not come up to this requirement, because it amounts to nothing more than pure dictum. The Court of Appeals itself would not feel bound by what is there said, and, of course, this court is not bound thereby. That the federal courts are not affected by dicta in state decisions is stated by Mr. Justice Curtis in the case of Carroll v. Carroll's Lessee, 16 How. 257, 14 L. Ed. 936, in these words:

"If the Court of Appeals had found it necessary to construe a statute of that state in order to decide upon the rights of parties subject to its judicial control, such a decision, deliberately made, might have been taken by this court as a basis on which to rest our judgment. But it must be remembered that we are bound to decide a question of local law, upon which the rights of parties depend, as well as every other question, as we find it ought to be decided. In making the examination preparatory to this finding, this court has followed two rules, one of which belongs to the common law, and the other is a part of our peculiar judicial system. The first is the maxim of the common law, 'stare decisis.' The second grows out of the thirty-fourth section of the judiciary act (1 Stat. 92, c. 20), which makes the laws of the several states the rules of decision in trials at the common law; and, inasmuch as the states have committed to their respective judiciaries the power to construe and fix the meaning of the statutes passed by their Legislatures, this court has taken such constructions as part of the law of the state, and has administered the law as thus construed. But this rule has grown up, and been held with constant reference to the other rule, 'stare decisis,' and it is only so far and in such cases as this latter rule can operate that the other has any effect. If the construction put by the court of a state upon one of its statutes was not a matter in judgment, if it might have been decided either way without affecting any right brought into question, then, according to the principles of the common law, an opinion on such a question is not a decision. To make it so, there must have been an application of the judicial mind to the precise question necessary to be determined to fix the rights of the parties and decide to whom the property in contestation belongs. And therefore this court, and other courts organized under the common law, has never held itself bound by any part of an opinion, in any case, which was not needful to the ascertainment of the right or title in question between the parties. In Cohens v. State of Virginia, 6 Wheat. 399, 5 L. Ed. 257, this court was much pressed with some portion of its opinion in the case of Marbury v. Madison, 1 Cranch, 137, 2 L. Ed. 60. And Mr. Chief Justice Marshall said: 'It is a maxim not to be disregarded that general expressions in every opinion are to be taken in connection with the case in which those expressions are used. If they go beyond the case they may be respected,

but ought not to control the judgment in a subsequent suit, when the very point is presented. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated. The cases of Ex parte Christy, 3 How. 292, 11 L. Ed. 603, and Peck v. Jenness et al., 7 How. 612, 12 L. Ed. 841, are an illustration of the rule that any opinion given here or elsewhere can-not be relied on as a binding authority unless the case called for its expres-sion. Its weight of reason must depend on what it contains. With these views, we cannot regard the opinion of the Court of Appeals as an authority on which we have a right to rest our judgment. We have already stated the reasons which have brought us to a different construction of the statute—reasons which do not seem to us to be shaken by the opinion of the Court of Appeals."

Then, as to the cases of Breathitt C., I. & L. Co. v. Strong and West v. Chamberlain: Undoubtedly the question at issue here was involved therein, and the judgments in these cases made it res judicata be-tween the parties thereto and their privies. But in neither one of them was the statute construed, and, if Judge Paynter meant to say in the former case that that question did not merit consideration, he evidently said it under a misapprehension. He must have thought that the patent therein involved was the "very selfsame" patent which had been directed to issue in Register v. Reid, which, as we have seen, was not the case. These, then, are all the cases in which said question was involved or considered, and it is not to be gathered from them that it is the settled construction of the statute in this state in question that a patent could issue thereunder for a survey in excess of 200 acres. Besides this, these cases have all arisen lately. Nothing had been said or done prior thereto that could have caused any one to believe that such a patent could issue thereunder. The only decision prior thereto was that of Register v. Reid, and, as here-tofore said, every implication to be drawn from that case is that it could not. The plaintiffs herein claim as devisees of the original patentee, and cannot be said to have been misled by said recent de-cisions. In view of these considerations, we think that this court is at liberty to construe the statute in accordance with its own notions. We are not entirely free from doubt as to this. But that is the best judgment we have in regard to the matter.

The conclusion which we have thus far reached is that there was no statutory authority for the issuance of the patent under which plaintiffs claim, and that this want of authority appears from an inspection of the patent. It is yet to be considered what is the effect of this want of authority so appearing. Is it, or not, to render the patent void on its face and make it subject to a collateral attack? We think clearly so. And this is recognized by all the authorities. In the case of Polk's Lessee v. Wendal, supra, Mr. Chief Justice Mar-shall said:

"The first exception is to the admission of the grant set up by the de-fendants in bar of the plaintiff's title. This objection alleges the grant to be absolutely void for three causes. The first is that no grant could lawfully issue for the quantity of land expressed in this patent. If this objection be well founded, it will be conclusive. Its correctness depends on the laws of the state of North Carolina."

In the case of Patterson v. Winn, 11 Wheat. 380, 6 L. Ed. 500, Mr. Justice Thompson said:

"We may therefore assume as the settled doctrine of this court that if a patent is absolutely void upon its face, or the issuing thereof was without authority, or was prohibited by statute, or if the state had no title, it could be impeached collaterally in a court of law in an action of ejectment; but, in general, other objections and defects complained of must be put in issue in a regular course of pleading in a direct proceeding to avoid the patent."

And in the case of Smelting Co. v. Kemp, supra, Mr. Justice Field said:

"If the patent, according to the doctrine, be absolutely void on its face, it may be collaterally impeached in a court of law. It is seldom, however, that the recitals of a patent will nullify its granting clause, as, for instance, that the land which it purports to convey is reserved from sale. Of course, should such inconsistency appear, the grant would fail. Something more, however, than an apparent contradiction in its terms is meant, when we speak of a patent being void on its face. It is meant that the patent is seen to be invalid, either when read in the light of the existing law, or by reason of what the court must take judicial notice of; as, for instance, that the land is reserved by statute from sale, or otherwise appropriated, or that the patent is for an unauthorized amount, or is executed by officers who are not invested by law with the power to issue grants of portions of the public domain."

The same doctrine is laid down or recognized by the Court of Appeals of Kentucky. In the case of Bledsoe's Devisees v. Wells, 4 Bibb, 329, Judge Boyle said:

"It would seem, therefore, necessarily to result that a patent in consideration of a treasury warrant could not be legally granted for such land, and, if it had appeared upon the face of the patent in this case that it had issued for land within that tract of country, we would have had no doubt that it was void; but we are of opinion that parol evidence of a fact dehors the patent was not admissible in this case for the purpose of avoiding or defeating the patent, for, although a patent, when it appears on its face to be illegal, may be considered void and treated as a nullity, yet, if it appear perfect on its face, it cannot be vacated by matter dehors the patent, but by scire facias or other regular mode of proceeding instituted for the purpose of vacating it."

In the case of Taylor v. Fletcher, 7 B. Mon. 80, Judge Ewing said:

"A patent, * * * while it remains in force, and is not vacated or annulled by some direct mode of proceeding calling in question its validity, should not, in the general, be collaterally impeached or questioned, unless in the case where its own nullity or illegality appears on its face, in which case the evidence of its nullity is of as high grade as the evidence of the grant."

It will be noticed that Judge Ewing says that a patent cannot be collaterally attacked, unless void on its face, "in the general." This implies that there are cases where it can be collaterally attacked, even though its invalidity does not appear on its face. And Judge Ewing, further on in his opinion, states the cases where a patent can be collaterally attacked, though its invalidity does not so appear, as exceptions to the general rule. He says:

"There are two exceptions to the rule here laid down with respect to the impeachment of patents. The first is where the Legislature has declared that the patent shall be void if issued in contravention of a described state of

case. The second is where they have declared that the patent shall be deemed fraudulent if issued under similar circumstances."

Counsel for plaintiffs seem to think that these two cases are the only cases in which a patent can be attacked collaterally, whereas they are the only cases in which they can be attacked collaterally where the patent is not void on its face. Where that is the case, it can be so attacked, as well as in those two cases, thus making three contingencies in all in which a patent can be so attacked. And in the case of Frazier v. Frazier, 81 Ky. 138, Judge Hargis speaks of all three in the same connection. He says:

"According to the current of recognized authority, the validity of a patent cannot be inquired into, nor can a party travel behind it to show it to be void, in a collateral proceeding or issue, unless the patent is void upon its face, or has been issued in contravention of a state of case described by statute, and which the statute declares shall render such patents void, or under such circumstances as the statute declares to be fraudulent. The facts which bring the patent within the statutory denunciation may be shown by parol proof in a collateral proceeding, or the patent may be relied on to show its own invalidity appearing on its face. We know of no other mode of attacking a patent in a collateral proceeding."

But it is argued that defendants cannot so attack the patent under which plaintiffs claim, because it does not appear that they have any interest in the land covered by the patent; and authorities are cited to the effect that a person not having an interest in land cannot attack a patent covering it directly. But this doctrine has no application here, where the patent is being asserted as against defendants. Plaintiffs are seeking relief herein against the defendants, and certainly are not entitled to any relief against them, if they are claiming under a patent void on its face, though defendants may have no interest whatever in the land.

In view of these considerations, therefore, we feel constrained to sustain the demurrers and overrule the exceptions, and orders will be entered accordingly.

### Addition to Opinion of March 9, 1903.
#### (June 10, 1903.)

Since handing down the foregoing opinion our attention has been directed by a friend of the court to an act of the Legislature of Kentucky approved the 9th day of March, 1868 (1 Sess. Acts 1867–68, p. 70, c. 1162) which is in these words:

"An act to legalize the issual of grants for quantities of land greater than two hundred acres.

"Whereas, the provisions of the Revised Statutes of Kentucky upon the subject limit the quantity of land for which an order may be procured to two hundred acres; and whereas, in some instances, surveys have been made, founded on two or more of these county court orders, for quantities exceeding two hundred acres; and whereas, in a few instances, clerks of county courts have issued 'warrants' for quantities larger than two hundred acres, upon which surveys were made and filed in the land office, upon which the register, in absence of 'caveat' or other objections, issued grants; and whereas, doubts are entertained as to the legality of these grants; to remove which and grant said titles,

"Be it enacted by the General Assembly of the commonwealth of Kentucky:

"1. That all acts of the register of the land office, carrying into grants surveys filed in his office for quantities of land in excess of two hundred acres, be, and the same are hereby, declared legal and valid, unless the warrant was procured, the survey made, and carried into grant by surveyors, or their deputies, for their own use and benefit, in which case this act shall not apply.

"2. This act shall be in force from its passage."

This act is confirmatory of the construction we have placed upon the Revised Statutes, the same as the acts of March 9 and March 27, 1872, and for the reason given as to them. In view of this act, the case of West v. Chamberlain was correctly decided. The patent involved therein had been issued in 1855, and was therefore no doubt validated by said act. In view thereof, in connection with the acts of March 9 and March 27, 1872, no apprehension need be had of the position taken herein affecting to any great extent innocent purchasers of vacant lands taken up in the same way as those involved herein were. Said act of March 9, 1868, validates all patents for a greater quantity of vacant land issued prior to that date not within the exception therein stated. The act of March 9, 1872, validates all surveys for greater quantities of such land then on file, or which might be filed within 60 days thereafter, in the registers' offices for the lands in the counties covered by it; and the act of March 27, 1872, authorizes the issuance of patents for lands theretofore or thereafter surveyed for any number of acres in the counties covered by it. And since the General Statutes went into force December 1, 1873, no patent has been issued for a greater number of acres than 200 acres, because said statute provided that one person could not acquire by separate patents even more than 200 acres. It follows, from this, that the number of innocent purchasers who could possibly be affected by this decision must be very limited. It is certain that plaintiffs herein are not innocent purchasers, because they claim as devisees of the original patentee. It is certain, further, that, if any such purchasers are affected, they were not misled by anything decided by the courts having jurisdiction of the matter, as has been heretofore shown. If misled at all, it must have been by an unwarranted interpretation of the decision of Register v. Reid by legal counsel whose advice may have been sought in the matter, and the courts should not be induced thereby to do that which amounts to a repeal or nullification of an act of the Legislature. Besides, it is never advisable to accept mere statements as to the effect of a decision in determining what it should be, for the reason, if none other, the matter so stated not having been investigated, the court is liable to be misled. And this case affords a good illustration of such danger.